# Exhibit B

**FEDERAL DEPOSIT INSURANCE CORPORATION**

**WASHINGTON, D. C.**

| | |
|---|---|
| In the Matter of | ) NOTICE OF CHARGES |
| | ) FOR AN ORDER TO |
| | ) CEASE AND DESIST AND |
| COMPUCREDIT CORPORATION | ) FOR RESTITUTION; |
| ATLANTA, GEORGIA | ) NOTICE OF |
| | ) ASSESSMENT OF CIVIL |
| An Institution-Affiliated Party of: | ) MONEY PENALTIES; |
| | ) FINDINGS OF FACT AND |
| COLUMBUS BANK AND TRUST COMPANY | ) CONCLUSIONS OF LAW; |
| COLUMBUS, GEORGIA | ) ORDER TO PAY; AND |
| | ) NOTICE OF HEARING |
| (Insured State Nonmember Bank) | ) |
| | ) FDIC-08-139b |
| | ) FDIC-08-140k |

The Federal Deposit Insurance Corporation (FDIC), being of the opinion that

CompuCredit Corporation, Atlanta, Georgia (CompuCredit), as an institution-affiliated

party of the Columbus Bank and Trust Company, Columbus, Georgia (Bank), has

engaged in violations of law and/or regulations and, unless restrained, CompuCredit will

continue to engage in such violations, hereby institutes this proceeding to determine

whether appropriate orders should be issued against CompuCredit under the provisions of

sections 8(b)(1), 8(b)(6), and 8(i) of the Federal Deposit Insurance Act (FDI Act), 12

U.S.C. §§ 1818(b)(1), 1818(b)(6), and 1818(i).  The FDIC hereby issues this NOTICE

OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND FOR

RESTITUTION; NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES,

FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER TO PAY; AND

NOTICE OF HEARING (collectively, NOTICE) pursuant to the provisions of the FDI

EXHIBIT B - 1

Act, 12 U.S.C. §§ 1811-1831aa and the FDIC's Rules of Practice and Procedures, 12 C.F.R. Part 308, and alleges as follows:

### JURISDICTION

1. CompuCredit is, and at all times relevant to this proceeding has been, a corporation organized, existing, and doing business under the laws of the State of Georgia, and has its principal place of business in Atlanta, Georgia.

2. The Bank is, and at all times relevant to this proceeding has been, a "State nonmember bank" within the meaning of section 3(e)(2) of the FDI Act, 12 U.S.C. § 1813(e)(2); and an "insured depository institution" within the meaning of section 3(c)(2) of the FDI Act, 12 U.S.C. § 1813(c)(2).

3. At all times relevant to this proceeding, CompuCredit has been an "institution-affiliated party" of the Bank as that term is defined in section 3(u) of the FDI Act, 12 U.S.C. § 1813(u), and for purposes of section 8(b) and 8(i) of the Act, 12 U.S.C. §§ 1818(b) and 1818(i).

4. Since at least 1997, pursuant to a contractual arrangement, the Bank and CompuCredit have conducted credit card lending throughout the United States targeted at, among others, consumers who have inadequate or poor credit histories and, consequently, have limited credit options.

5. The FDIC is the "appropriate Federal banking agency", as that term is defined in section 3(q)(3) of the FDI Act, 12 U.S.C. § 1813(q)(3) and has jurisdiction over CompuCredit, as an institution-affiliated party of the Bank, and the subject matter of this proceeding.

## VIOLATIONS OF SECTION 5 OF THE FEDERAL TRADE COMMISSION ACT

6.      At all times relevant to this proceeding, CompuCredit's acts and practices, as an institution-affiliated party of the Bank, as described in this NOTICE, have been in or affecting "commerce," as that term is defined in section 4 of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 44.

7.      Beginning in at least 2001, CompuCredit engaged in unfair or deceptive acts and/or practices in violation of section 5(a) of the FTC Act, 15 U.S.C. § 45(a) (Section 5), in connection with its credit card programs, as more fully alleged below.

8.      CompuCredit is engaged in and, since at least 1997, has been engaged in the business of providing various consumer credit products, including credit cards, and related financial services throughout the United States. CompuCredit offers these products and services by, among other things, entering into contracts with banks, including the Bank, pursuant to which CompuCredit markets and services credit cards.

9.      On or about January 6, 1997, the Bank and CompuCredit first entered into an Affinity Card Program Agreement and Accounts Ownership and Administration Agreement (Affinity Agreement) providing for, among other things, the marketing and issuance of credit cards.

10.      At all times relevant to this proceeding, there has been an Affinity Agreement or a successor amended Affinity Agreement in place between the Bank and CompuCredit (hereafter collectively, Affinity Agreements).

11.      Pursuant to the Affinity Agreements, the Bank issues the credit cards and owns the credit card accounts. CompuCredit markets the credit cards and services the accounts. CompuCredit also purchases the credit card receivables from the Bank on a

3

EXHIBIT B - 3

daily basis, and pays the Bank a monthly fee based upon the number of account statements processed.

12.     Since at least 2001, CompuCredit has marketed credit cards throughout the United States under the brand names Aspire Visa and Majestic Visa. The Aspire brand includes at least two credit card products -- referred to internally by CompuCredit as the Aspire Little Rock card (Little Rock) and the Aspire Core card (Core).

13.     Under the Affinity Agreements, CompuCredit had the sole and exclusive right to solicit applications for the Aspire and Majestic products. CompuCredit created, designed, and distributed the marketing materials; established the credit cards' terms and conditions; developed the underwriting and credit criteria; and maintained customer service functions.

14.     Pursuant to the Affinity Agreements, CompuCredit was responsible for ensuring that the Aspire and Majestic credit card marketing and solicitation practices complied with all applicable laws, including Section 5.

I.  **Aspire Little Rock Program**

15.     CompuCredit marketed the Little Rock credit cards through pre-screened direct mail solicitations, inbound and outbound telemarketing, and the Internet.

16.     As described below, CompuCredit's written solicitations for the Little Rock card misled consumers into believing that they would receive a Visa credit card with $300 in available credit. Consumers actually received considerably less available credit due to significant upfront fees that were immediately charged to the credit card. CompuCredit also failed to disclose adequately the significant upfront fees that consumers would be charged.

4

17. Beginning approximately April 2001, the Bank and CompuCredit issued 2,068,134 Aspire Little Rock credit cards to consumers who responded to these solicitations. More than 1.1 million consumers activated their accounts.

18. CompuCredit targeted consumers whose credit scores were typically between 450 and 600, and who had limited credit options.

19. The Little Rock product was marketed as a Visa credit card with an initial credit limit of typically $300 with no deposit required, no deposit fee, and/or no application fee.

20. However, initial fees, typically consisting of an annual fee of $150 and an account opening fee of $29, were charged and posted to the consumer's Little Rock account immediately after the consumer applied for and was issued a card.

21. Consumers were typically charged a monthly maintenance fee of $6.50. In many instances, this fee was posted to the consumer's account immediately after the consumer was issued a card. In other instances, the monthly maintenance fee was not billed to the account until the consumer made his or her first purchase.

22. The Little Rock initial fees and charges, typically $185.50, reduced the consumer's available credit from $300 to $114.50 before the consumer ever used the card.

23. Additionally, consumers were required to make an initial minimum payment of $20, sometimes referred to as an "activation payment," before the Little Rock card could be used.

**Deceptive Marketing Materials and Practices**

24. At all times relevant to this proceeding, CompuCredit marketed the Little

5

Rock card by sending consumers direct mail solicitation packages.

25.    A typical and illustrative direct mail solicitation package contained the following items: (1) an outside envelope; (2) a one-page cover letter; (3) a one-page document titled "Visa Pre-Qualified Acceptance Certificate"; (4) a folded insert titled "Introducing: the Aspire Visa Card"; and (5) a two-sided document titled "Summary of Credit Terms" on one side and "Terms of Offer" on the other.

26.    A typical and illustrative direct mail solicitation package repeatedly, and with bold emphasis, used words and phrases like "pre-qualified," "no application fee," and "no deposit required." The cover letter of the solicitation package stated that the consumer was pre-qualified for an unsecured Aspire Visa card with a credit limit of $300.

27.    The solicitation failed to adequately disclose that consumers would be immediately billed the $150 annual fee, the $29 account opening fee, and for certain solicitations, the $6.50 monthly maintenance fee. The solicitation package also did not adequately disclose that consumers would be required to make an initial payment before the Little Rock card would be activated. For some solicitations, the package did not adequately disclose that once the card was used, a $6.50 monthly account maintenance fee would be charged to the account.

28.    A typical and illustrative direct mail solicitation package was deceptive in nature because it manipulated the words used or omitted words; the placement and size of the text; and the overall arrangement of the solicitation packages to represent, expressly or by implication, that consumers were pre-approved to receive a credit card that had $300 in available credit.

29.    These direct mail solicitation packages, when viewed as a whole, were

6

EXHIBIT B - 6

deceptive in nature because they failed to adequately disclose the actual available credit, the fees, and costs of the Little Rock card and the impact of the fees and costs on the available credit.

30. The solicitation package instructed consumers who wished to obtain the Aspire Visa card to complete and return the "Acceptance Certificate," call a toll-free number, or respond over the Internet.

31. Upon the consumer's acceptance of the Little Rock card direct mail solicitation offer, if the consumer was approved for the card, he or she was sent a fulfillment package.

32. The fulfillment package included the consumer's Little Rock credit card that was not activated, a copy of the Bank Credit Card Agreement, and a payment coupon informing the consumer that an initial payment of $20 was required before the card could be activated and used. The package also listed a phone number where the consumer could call to pay the initial payment by telephone. The $20 payment was applied against the consumer's Little Rock account balance.

33. A typical and illustrative fulfillment package included in small type and on the reverse side of the credit card carrier information that there is an "annual fee," an "account opening fee," and a "monthly maintenance fee," This information was not as clear or prominent as, or in any proximity to, the representations about how to activate the card.

34. The fulfillment package led consumers to believe that they were obligated to make only a $20 payment to activate the card, and did not disclose, or disclosed inadequately, that significant upfront fees had already been charged to their

7

EXHIBIT B - 7

accounts.

## One Percent Minimum Payment Program for Past Due Accounts

35.     At all times relevant to these proceedings, in numerous instances, CompuCredit automatically and with no prior notice placed consumers who were more than 90 days delinquent on their Little Rock accounts into a payment reduction program known as the "1% Minimum Payment Program."

36.     At all times relevant to these proceedings, neither the payment reduction program, nor its terms and conditions were adequately disclosed or explained to consumers prior to their being placed in the program.

37.     Under this program consumers were encouraged to pay either 1% of their outstanding balance or $10, whichever was greater.

38.     CompuCredit represented, expressly or by implication, to consumers whose accounts were more than 90 days past due that enrollment in this program would help them become current on their accounts.

39.     CompuCredit failed to disclose the effects of the reduced minimum payments, including that such payments may not cover all the fees and charges assessed during the period of reduced minimum payments, resulting in an increase in the overall account balance and possibly the imposition of additional fees, including, but not limited to, overlimit fees.

40.     By reason of the foregoing, CompuCredit's failure to disclose, or failure to disclose adequately, material information regarding the 1% Minimum Payment Program was a deceptive act or practice in violation of Section 5.

41.     By reason of the acts and practices described in paragraphs 6 through 40,

8

CompuCredit violated Section 5 as follows:

(a)  CompuCredit represented, expressly or by implication, that consumers were "pre-qualified" to receive a Little Rock credit card with $300 of available credit.  In fact, consumers who responded to the solicitations and opened an account received only $114.50 or $121 of available credit due to the significant fees billed immediately to their accounts.  Therefore, CompuCredit's representations regarding the amount of credit that consumers would receive were false or misleading and a deceptive practice.

(b)  CompuCredit represented, expressly or by implication, that consumers were "pre-qualified" to receive a credit card with $300 of available credit with "No deposit required," "No deposit fee," and "No application fee."  CompuCredit failed to disclose or disclosed inadequately, that consumers would be charged substantial upfront fees, including an annual fee, an account opening fee, and a monthly maintenance fee.  In light of the representations made, CompuCredit's failure to disclose, or the failure to disclose adequately, the material information about the upfront fees that consumers would be charged, was a deceptive practice.

(c)  CompuCredit represented, expressly or by implication, to consumers whose accounts were more than 90 days delinquent that enrollment in the 1% Minimum Payment Program would help them become current on their accounts. CompuCredit failed to disclose the effects of the reduced minimum payments, including that such payments may not cover all fees and charges assessed during the period of reduced payments, resulting in an increase in the overall account balance and possibly the imposition of additional fees, including but not limited to, overlimit fees.  CompuCredit's

9

EXHIBIT B - 9

failure to disclose this program, or to disclose it adequately, was a deceptive practice.

42.    The actions alleged in paragraphs 6 through 41 above beginning in at least April 2001, represent CompuCredit's violations of Section 5 related to the Aspire Little Rock Program.

II. **Aspire Core Program**

43.    Since at least 2001, CompuCredit marketed the Aspire Core credit card as a "pre-qualified" credit card with a credit limit of up to $3,250 through direct-mail solicitations, inbound and outbound telemarketing, and on the Internet.

44.    The Aspire Core product was marketed to consumers whose credit scores were typically between 600 and 730.

45.    As described below, the Core solicitations misled consumers into believing that they would receive credit cards with available credit up to a certain amount and that the card could be used for any purpose. In fact, CompuCredit withheld half of the available credit until at least the fourth month after card activation. Further, CompuCredit used a behavior scoring model to reduce a cardholder's credit limit based on certain types of transactions.

46.    Beginning in 2001 through June 2006, CompuCredit originated 4,255,799 Core credit card accounts to consumers who responded to these solicitations.

**Aspire Core Marketing Materials and Practices**

47.    In a typical direct mail solicitation for the Core card, CompuCredit repeatedly represented to consumers, in bold text and in a larger font than other text in the solicitation, that they were "Pre-Qualified" for a credit card with a credit line of "up to" $3,250. Moreover, CompuCredit represented to consumers that "as long as you are

10

an active customer in good standing, we will review your account for increases periodically."

48.    From the inception of the Core card until approximately May 2005, CompuCredit failed to disclose in the solicitation materials that consumers who were approved for a credit limit in excess of $500 would be denied access to 50% of their approved credit limit for at least the first three months following activation of their card.

49.    Beginning in approximately May 2005, in some solicitations CompuCredit disclosed this 50% limitation in small font text in a footnote at the bottom of the direct mail solicitation cover letter.

50.    Beginning in approximately March 2006, CompuCredit included the following disclosure in the body of the direct mail solicitation cover letter:

> Your card comes with a great credit line!  For your protection, fifty percent will be available upon activation. If you keep your account in good standing, the rest will become available on the first day of the fourth month following your account opening date.

51.    Consumers who applied for the Core Visa card and were approved by CompuCredit were mailed a Visa card and a card carrier that set forth, in bold print at the tope of the page, the full amount of the credit limit for which the consumer was approved.

52.    The fulfillment materials also touted the benefits of using the card, representing that the card could be used wherever the consumer wanted.

53.    The fulfillment materials did not disclose, or disclosed inadequately, the 50% credit limitation described above.

54.    At all times relevant to this proceeding, despite the fact that the consumer was denied access to one-half of his or her approved credit limit, CompuCredit reported

11

the consumer's entire approved credit limit to the credit reporting bureaus.

### Reduction of Consumers' Credit Limits Based on Behavioral Scoring Models

55.     In a typical and illustrative Core Visa direct mail solicitation, CompuCredit represented that the credit card could be used for a variety of transactions, such as cash advances, and that the card could be used "at millions of places around the world."

56.     CompuCredit reduced the credit limits of many Core consumers without advance notice, thereby causing many consumers to be charged additional fees for exceeding their credit limits.

57.     CompuCredit reduced a consumer's credit limit based on undisclosed, or inadequately disclosed, transactional or behavioral scoring models that penalized consumers for using their credit cards in otherwise permissible and/or expressly advertised ways, including for cash advances.

### One Percent Minimum Payment Program for Past Due Core Accounts

58.     At all times relevant to these proceedings, in numerous instances, CompuCredit automatically and without prior notice placed consumers who were more than 90 days delinquent on their Core card accounts into a payment reduction program known as the "1% Minimum Payment Program."

59.     At all times relevant to these proceedings, neither the payment reduction program nor its terms and conditions were adequately disclosed or explained to consumers prior to their being placed in the program.

60.     Under this program consumers were encouraged to pay either 1% of their outstanding balance or $10, whichever was greater.

12

EXHIBIT B - 12

61.    CompuCredit represented, expressly or by implication, to consumers whose accounts were more than 90 days past due that enrollment in this program would help them become current on their accounts.

62.    CompuCredit failed to disclose the effects of the reduced minimum payments, including that such payments may not cover all the fees and charges assessed during the period of reduced minimum payments, resulting in an increase in the overall account balance and possibly the imposition of additional fees, including, but not limited to, overlimit fees.

63.    By reason of the foregoing, CompuCredit's failure to disclose or failure to adequately disclose material information regarding the 1% Minimum Payment Program was a deceptive act or practice in violation of Section 5.

64.    By reason of the acts and practices described in paragraphs 6 through 14 and 43 through 63, CompuCredit violated Section 5 as follows:

(a)    CompuCredit represented, expressly or by implication, that consumers were "pre-qualified" to receive a Core card with a credit limit of "up to" $3,250 of available credit.  In fact, consumers who responded to the solicitations and opened a Core account were denied access to 50% of their approved credit limit for at least the first three months following activation of their cards.  Therefore, CompuCredit's representations regarding the amount of credit that consumers received were false or misleading and a deceptive practice.

(b)    CompuCredit represented, expressly or by implication, that consumers who responded to the Core solicitations and opened an account could use their Core cards for a variety of transactions, including cash advances.  CompuCredit also

13

represented, expressly or by implication, that customers in good standing would be considered for periodic increases in their credit limits. In fact, CompuCredit failed to disclose, or failed to disclose adequately, that it would employ a behavioral scoring model to reduce consumers' credit lines if the consumers used their cards for certain types of transactions, including transactions mentioned in the solicitations. In light of the representations made, CompuCredit's failure to disclose, or failure to disclose adequately, this material information was a deceptive act or practice.

(c)    CompuCredit represented, expressly or by implication, to consumers whose accounts were more than 90 days delinquent that enrollment in the 1% Minimum Pay Program would help them become current on their accounts. CompuCredit failed to disclose the effects of the reduced minimum payments, including that they might not cover all fees and charges assessed during the period of reduced payments; resulting in an increase in the overall account balance and possibly the imposition of additional fees, including but not limited to, overlimit fees. CompuCredit's failure to disclose, or adequately disclose, this program was a deceptive practice.

65.    The actions alleged in paragraphs 6 through 14 and 43 through 64 above beginning in 2001 represent CompuCredit's violations of Section 5 related to the Aspire Core Program.

### III.  The Majestic Visa Program

66.    At all times relevant to these proceedings, beginning approximately May 2004, CompuCredit marketed the Majestic Program to consumers with unpaid debts that were charged off by prior creditors, including debts that were no longer subject to suit under the applicable statute of limitations and debts that were no longer being reported to

14

consumer reporting agencies because they were outside the seven-year limitation set forth in section 605 of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681c.

67. These unpaid debts had previously been purchased by Jefferson Capital Systems, LLC (Jefferson Capital), a wholly-owned subsidiary of CompuCredit. Jefferson Capital is a limited liability company organized and existing under the laws of the State of Georgia with its principal place of business in St. Paul, Minnesota.

68. As described below, the Majestic direct mail solicitations misled consumers into believing that they would immediately receive credit cards, with their prior debts transferred to the new cards and reported to consumer reporting agencies as paid in full. In fact, consumers who applied for the Majestic card entered into a debt repayment program. Consumers did not qualify for a credit card until they paid 25-50% of their prior debt within a specified time frame, and even if they made the required payments, consumers would receive only a nominal credit line.

69. To market the Majestic card, CompuCredit arranged for consumers to receive direct mail solicitations from Jefferson Capital. CompuCredit, through Jefferson Capital, targeted consumers with charged off debt with principal balances between $200 and $10,000. These direct mail solicitations included an introductory letter from Jefferson Capital, the card offer letter, and a "Condensed Bank Credit Card Agreement."

70. CompuCredit used several versions of the Majestic solicitation, depending on the amount of the original charged off account balance. All of the direct mail solicitations offered consumers a "no annual fee unsecured credit card" and stated in bold type, "You're Pre-Approved for the Majestic Visa Card" or "You're Pre-Approved for the New Majestic Fresh Start Solution and Visa Card." The solicitations encouraged

15

consumers to "Sign Up Today!" and proclaimed, "Soon you can enjoy all the convenience and benefits Visa has to offer."

71.    The Majestic direct mail solicitations informed consumers that Jefferson Capital "made an arrangement with the issuer of the Majestic Visa card to provide you with the opportunity to receive a no annual fee unsecured credit card." Consumers were also told that they were "Pre-Approved for the Majestic Visa Card." Consumers were not told that CompuCredit is both the parent company of Jefferson Capital and the company responsible for marketing the Majestic card for the Bank.

72.    The Majestic solicitations included a letter from Jefferson Capital stating that the offer was "an opportunity to satisfy this debt and enjoy the convenience of a new Visa card." The solicitations represented to consumers that their prior debt would be "transferred to a new Majestic Visa account as the first transaction on your new account." The solicitations further represented that "[a]s an added bonus, once you qualify to receive a Majestic Visa card, we will see to it that the credit bureaus are notified that your former account has been paid in full."

73.    The representations in the Majestic solicitations led consumers to believe that: (a) they would immediately receive a Majestic card upon acceptance of their "Pre-Approved" application; and (b) their charged off debt would be immediately transferred to a Majestic credit card account and reported to consumer reporting agencies as "paid in full."

74.    In fact, consumers who received the Majestic solicitations were not "pre-approved" to receive a Visa credit card. Rather, the Majestic Program was an attempt to collect consumers' charged off debt balances by enrolling consumers in a debt repayment

16

EXHIBIT B - 16

plan and, in some instances, renewing both the statute of limitations and the credit reporting periods on consumers' charged off debt.

75.     Moreover, consumers' charged off debts were not transferred to a Majestic credit card account "as the first transaction on [the] new account" or reported as "paid in full" when consumers responded to the solicitations. Instead, consumers were required to pay between 25% and 50% of their originally charged off account debt within 12 months before the remaining balance was transferred to the Majestic credit card account or the charged off debt was reported as paid in full. Only then did the consumer become eligible for the Majestic credit card.

76.     Even if a consumer made sufficient payments to receive the Majestic credit card, the available credit was typically only about 5% of the amount of the charged off debt balance that was transferred to the card. As a result, the Majestic card provided the consumer with little utility for purchases or cash advances.

77.     By reason of the acts and practices described in paragraphs 6 through 14 and 66 through 76, CompuCredit violated Section 5 as follows:

(a)     CompuCredit represented, expressly or by implication, that upon acceptance of a consumer's "Pre-Approved" application for a Majestic card, the consumer would immediately receive a Majestic Visa credit card. In fact, upon acceptance of the consumer's pre-approved application, CompuCredit did not immediately issue the consumer a Majestic Visa card. Rather, consumers were required to pay between 25 and 50% of their prior charged off debt before they would be eligible for a Majestic Visa card. CompuCredit's representations about the immediate availability of a credit card were false or misleading and a deceptive practice.

17

(b)     CompuCredit represented, expressly or by implication, that upon acceptance of a consumer's application for a Majestic card, the consumer's charged off debt would be immediately transferred to the Majestic account and be reported to the credit reporting agencies as "paid in full," and the prior debt would be satisfied. In fact, upon acceptance of the consumer's application, CompuCredit did not transfer the consumer's charged off debt to the card, report the debt as "paid in full" to the credit reporting agencies, or deem the prior debt as satisfied. Therefore, CompuCredit's representations about the prior charged off debt were false or misleading and a deceptive practice.

78.     The actions alleged in paragraphs 6 through 14 and 66 through 77 above beginning in at least May 2004 and represent CompuCredit's violations of Section 5 related to the Balance Transfer Program.

## RESTITUTION

79.     Each of the unfair or deceptive acts and practices described in paragraphs 6 through 78 above resulted in unjust enrichment to CompuCredit within the meaning of 12 U.S.C. § 1818 (b)(6).

80.     Each of the unfair or deceptive acts and practices described in paragraphs 6 through 78 above involved a reckless disregard for the law within the meaning of 12 U.S.C. § 1818 (b)(6).

81.     As a result of the conduct described in paragraphs 1 through 80 above, consumers were aggrieved in an amount not presently ascertainable, but likely to exceed $150 million.

18

EXHIBIT B - 18

## NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES, FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER TO PAY; AND NOTICE OF HEARING

### NOTICE OF ASSESSMENT

82.    The FDIC incorporates the allegations of paragraphs 1 through 81 as FINDINGS OF FACT AND CONCLUSIONS OF LAW for purposes of this NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES (NOTICE OF ASSESSMENT) as though fully set out herein.

### ORDER TO PAY

83.    By reason of the violations of law set forth in the NOTICE OF ASSESSMENT, the FDIC concluded that a civil money penalty should be assessed against CompuCredit pursuant to section 8(i)(2) of the FDI Act, 12 U.S.C. § 1818(i)(2). After taking into account the appropriateness of the penalties with respect to the size of the financial resources and good faith of CompuCredit, the gravity of the violations, the history of previous violations, and such other matters as justice may require, it is:

ORDERED that by reason of the violations set forth in the NOTICE OF ASSESSMENT, a penalty of Four Million Eight Hundred Thirty-Six Thousand Dollars ($4,836,000) be, and hereby is, assessed against CompuCredit pursuant to section 8(i)(2) of the FDI Act, 12 U.S.C. § 1818(i)(2);

FURTHER ORDERED, that the effective date of this ORDER TO PAY be, and hereby is, stayed until 20 days after the date of service of the NOTICE OF ASSESSMENT, during which time CompuCredit may file an answer and request a hearing pursuant to section 8(i)(2)(H) of the FDI Act, 12 U.S.C. § 1818(i)(2)(H), and section 308.19 of the FDIC's Rules of Practice and Procedure, 12 C.F.R. § 308.19.

19

84.    CompuCredit must specifically request a hearing within 20 days of service of the NOTICE OF ASSESSMENT, pursuant to section 8(i)(2)(H) of the FDI Act, 12 U.S.C. § 1818(i)(2)(H), and section 308.19 of the FDIC's Rules of Practice and Procedure, 12 C.F.R. § 308.19.   If CompuCredit fails to request a hearing within 20 days of service of this NOTICE OF ASSESSMENT, the penalty assessed against CompuCredit pursuant to the ORDER TO PAY will be final and unappealable and shall be paid within 60 days after the date of service of this NOTICE OF ASSESSMENT.

85.    In the event CompuCredit requests a hearing, CompuCredit shall also file an answer to the charges in the NOTICE OF ASSESSMENT within 20 days of service of the NOTICE OF ASSESSMENT, in accordance with section 308.19 of the FDIC's Rules of Practice and Procedure, 12 C.F.R. § 308.19.

## NOTICE OF HEARING

86.    Notice is hereby given that a hearing will be held in Atlanta, Georgia, commencing 60 days from the date of service of the NOTICE OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND FOR RESTITUTION, or on such date and at such place as may be set by the Administrative Law Judge appointed to hear the matter, for the purpose of taking evidence on the charges specified in the NOTICE OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND FOR RESTITUTION and to determine whether an appropriate order should be issued under the FDI Act requiring CompuCredit to:

(a)    cease and desist from violations of law specified therein; and

(b)    take affirmative action to correct the conditions resulting from such violations, including making restitution and/or providing reimbursement to affected

20

consumers.

87.    If CompuCredit requests a hearing with respect to the charges specified in the NOTICE OF ASSESSMENT, evidence shall also be taken on the charges specified therein at the same time and place for the purpose of determining whether CompuCredit shall be ordered to forfeit and pay a civil money penalty in accordance with section 8(i)(2) of the FDI Act, 12 U.S.C. § 1818(i)(2).

88.    The hearing will be held before an Administrative Law Judge to be appointed by the Office of Financial Institution Adjudication pursuant to 5 U.S.C. § 3105.  The hearing will be public, and in all respects will be conducted in compliance with the FDI Act, the Administrative Procedures Act, 5 U.S.C. §§ 551 - 559, and the FDIC Rules of Practice and Procedure, 12 C.F.R. Part 308.

89.    CompuCredit is directed to file an answer to the NOTICE OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND FOR RESTITUTION within 20 days from the date of service, as provided in 12 C.F.R. § 308.19 of the FDIC Rules of Practice and Procedure.

90.    The original and one copy of all papers filed or served in this proceeding shall be filed with the Office of Financial Institution Adjudication, 1700 G Street, N.W., Washington, D.C. 20552, pursuant to section 308.10 of the FDIC Rules of Practice and Procedure, 12 C.F.R. § 308.10.  Copies of all papers filed or served in this proceeding shall be served upon Robert Feldman, Executive Secretary, Federal Deposit Insurance Corporation, 550 17th Street, N.W. (F-1058), Washington, D.C. 20429-9990; A.T. Dill III, Senior Counsel, Enforcement Unit, Legal Division, Federal Deposit Insurance Corporation, 550 17th Street, N.W. (MB-3124), Washington, D.C. 20429-9990; and

21

Andrea Fulton Toliver, Regional Counsel (Supervision), Federal Deposit Insurance

Corporation, 10 Tenth Street, N.E., Suite 800, Atlanta, Georgia 30309.

Pursuant to delegated authority.

Dated this 10th day of June 2008.

Sandra L. Thompson
Director
Division of Supervision and Consumer Protection

22

EXHIBIT B - 22