# Exhibit C

**FEDERAL DEPOSIT INSURANCE CORPORATION**

**WASHINGTON, D. C.**

| | |
|---|---|
| In the Matter of | NOTICE OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND FOR RESTITUTION; NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES; FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER TO PAY; AND NOTICE OF HEARING |
| FIRST BANK OF DELAWARE WILMINGTON, DELAWARE | |
| (Insured State Nonmember Bank) | |
| And | |
| COMPUCREDIT CORPORATION ATLANTA, GEORGIA An Institution-Affiliated Party of: | |
| FIRST BANK OF DELAWARE WILMINGTON, DELAWARE | FDIC-07-256b FDIC-07-257k |
| (Insured State Nonmember Bank) | |

The Federal Deposit Insurance Corporation (FDIC), being of the opinion that

First Bank of Delaware, Wilmington, Delaware (Bank) and CompuCredit Corporation,

Atlanta, Georgia (CompuCredit), an institution-affiliated party of the Bank, have engaged

in violations of law and/or regulations and in unsafe and/or unsound banking practices

and, unless restrained, the Bank and CompuCredit will continue to engage in such

practices and violations in conducting the business of the Bank, hereby institutes this

proceeding to determine whether appropriate orders should be issued against the Bank

and CompuCredit under the provisions of sections 8(b)(1), 8(b)(6), and 8(i) of the Federal

Deposit Insurance Act (FDI Act), 12 U.S.C. §§ 1818(b)(1), 1818(b)(6), and 1818(i). The

FDIC hereby issues this NOTICE OF CHARGES FOR AN ORDER TO CEASE AND

DESIST AND FOR RESTITUTION; NOTICE OF ASSESSMENT OF CIVIL MONEY

EXHIBIT C - 1

PENALTIES, FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER TO PAY; AND NOTICE OF HEARING (collectively, NOTICE) pursuant to the provisions of the FDI Act, 12 U.S.C. §§ 1811-1831aa, and the FDIC's Rules of Practice and Procedures, 12 C.F.R. Part 308, and alleges as follows:

## JURISDICTION

1.      The Bank is, and at all times relevant to this proceeding has been, a corporation organized, existing, and doing business under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware.

2.      The Bank is, and at all times relevant to this proceeding has been, a "State nonmember bank" within the meaning of section 3(e)(2) of the FDI Act, 12 U.S.C. § 1813(e)(2); an "insured depository institution" within the meaning of section 3(c)(2) of the FDI Act, 12 U.S.C. § 1813(c)(2); and subject to the FDI Act, 12 U.S.C. §§ 1811-1831aa, the FDIC's Rules and Regulations, 12 C.F.R. Chapter III, and the laws of the State of Delaware.

3.      CompuCredit is, and at all times relevant to this proceeding has been, a corporation organized, existing, and doing business under the laws of the State of Georgia, and has its principal place of business in Atlanta, Georgia.

4.      Since at least February 2005, pursuant to contractual arrangements, the Bank and CompuCredit have engaged in credit card lending activities throughout the United States targeted at, among others, consumers who have inadequate or poor credit histories and, consequently, have limited credit options.

5.      At all times relevant to this proceeding, CompuCredit has been an "institution-affiliated party" as that term is defined in section 3(u) of the FDI Act, 12

2

EXHIBIT C - 2

U.S.C. § 1813(u), and for purposes of section 8(b) and 8(i) of the Act, 12 U.S.C. §§ 1818(b) and 1818(i).

6.     Continental Finance Company, LLC (Continental Finance) is, and at all times relevant to this proceeding has been, a limited liability company organized, existing, and doing business under the laws of the State of Delaware, and has its principal place of business in Newark, Delaware.

7.     Since at least March 2006, pursuant to a contractual arrangement, the Bank, through Continental Finance, has conducted credit card lending throughout the United States targeted at, among others, consumers who have inadequate or poor credit histories and, consequently, have limited credit options.

8.     The FDIC is the "appropriate Federal banking agency", as that term is defined in section 3(q)(3) of the FDI Act, 12 U.S.C. § 1813(q)(3), with respect to the Bank, and has jurisdiction over the Bank and CompuCredit, as an institution-affiliated party of the Bank, and the subject matter of this proceeding.

9.     At all times relevant to this proceeding, the Bank's acts and practices, as described in this NOTICE, have been in or affecting "commerce," as that term is defined in section 4 of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 44.

## VIOLATIONS OF SECTION 5 OF THE FEDERAL TRADE COMMISSION ACT

### (as to the Bank and CompuCredit)

10.     At all times relevant to this proceeding, CompuCredit's acts and practices, as an institution-affiliated party of the Bank, as described in this NOTICE, have been in or affecting "commerce," as that term is defined in section 4 of the FTC Act, 15 U.S.C. § 44.

3

EXHIBIT C - 3

11.    Beginning in at least February 2005, the Bank and CompuCredit engaged in unfair or deceptive acts and/or practices in violation of section 5(a) of the FTC Act, 15 U.S.C. § 45(a) (Section 5), in connection with their lending activities as more fully alleged below.

12.    CompuCredit is engaged in and, since at least 1997, has been engaged in the business of providing various consumer credit products, including credit cards, short-term installment loans (ILPs) and related financial services throughout the United States. CompuCredit offers these products and services by, among other things, entering into contracts with banks, including the Bank, pursuant to which CompuCredit markets and services credit products.

13.    On or about February 16, 2005, the Bank and CompuCredit first entered into an Affinity Card Agreement (CompuCredit Affinity Agreement) providing for, among other things, the marketing and issuance of credit cards.

14.    At all times relevant to this proceeding, there has been a CompuCredit Affinity Agreement or a successor amended and/or restated Affinity Agreement in place between the Bank and CompuCredit (hereafter collectively, CompuCredit Affinity Agreements).

15.    Pursuant to the CompuCredit Affinity Agreements, the Bank issues the credit cards and owns the credit card accounts. CompuCredit markets the credit cards and services the accounts on behalf of the Bank. CompuCredit also purchases the credit card receivables from the Bank on a daily basis, and pays the Bank a monthly fee based upon the number of account statements processed.

16.    Since at least 2005, the Bank and CompuCredit marketed credit cards

4

EXHIBIT C - 4

throughout the United States under certain brand names including Tribute MasterCard, Imagine MasterCard, Purpose Advantage Credit Card and the Embrace Visa Card (collectively, CompuCredit Cards). The Tribute and Imagine MasterCards are referred to internally by the Bank and CompuCredit as the Little Rock cards (Little Rock Cards).

17.    Pursuant to the CompuCredit Affinity Agreements, CompuCredit had the sole and exclusive right to solicit applications for the CompuCredit Cards. CompuCredit created, designed, and distributed the marketing materials; established the credit cards' terms and conditions; developed the underwriting and credit criteria; and maintained customer service functions.

18.    The CompuCredit Affinity Agreements required CompuCredit to submit to the Bank for prior review and approval before they were used in connection with the CompuCredit Cards: (a) all marketing and solicitation materials such as mail solicitations, telemarketing scripts, promotional material and advertising marketing; (b) administrative materials such as manuals, training materials, policies, and written procedures; and (c) consumer materials including cardholder agreements, billing statements, statement inserts, and form letters.

19.    As the credit card issuer and the account owner of the CompuCredit Cards, the Bank was responsible for ensuring that the marketing and solicitation practices for the CompuCredit Cards complied with all applicable laws, including Section 5.

20.    Pursuant to the CompuCredit Affinity Agreements, CompuCredit was responsible for ensuring that the marketing and solicitation practices for the CompuCredit Cards complied with all applicable laws, including Section 5.

EXHIBIT C - 5

## I. <u>Little Rock Cards Program</u>

21.    The Bank and CompuCredit marketed the Little Rock Cards through pre-screened direct mail solicitations, inbound and outbound telemarketing, and on the Internet.

22.    As described below, the written solicitations for the Little Rock Cards misled consumers into believing that they would receive a MasterCard credit card with $300 in available credit.  The solicitations also failed to disclose adequately the significant up-front fees that consumers would be charged.

23.    Beginning approximately July 2005, the Bank issued 366,908 Little Rock Cards to consumers who responded to these solicitations and there were more than 271,700 active accounts as of June 2006.

24.    The Bank and CompuCredit targeted consumers whose credit scores were typically between 450 and 600, and who had limited credit options.

25.    The Little Rock products were marketed as MasterCard credit cards with an initial credit limit of typically $300 with no deposit required, no deposit fee, and/or no application fee.

26.    However, initial fees, typically consisting of an annual fee of $150 and an account opening fee of $29, were charged and posted to the consumer's Little Rock account immediately after the consumer applied for and was issued a card.

27.    The Bank and CompuCredit also typically charged the consumer a monthly maintenance fee of $6.50.  In some instances, this fee was posted to the consumer's account immediately after the consumer was issued a card.  In other instances, the monthly maintenance fee was not billed to the account until the consumer

6

EXHIBIT C - 6

made his or her first purchase.

28.     The Little Rock Cards initial fees and charges typically of $185.50 reduced the consumer's available credit from $300 to $114.50 before the consumer ever used the card.

29.     As part of this program, consumers were required to make an initial minimum payment of $20, sometimes referred to as an "activation payment," before the Little Rock Cards could be used.

## Deceptive Marketing Materials and Practices

30.     At all times relevant to this proceeding, the Bank and CompuCredit marketed the Little Rock Cards by sending consumers direct mail solicitation packages.

31.     A typical and illustrative direct mail solicitation package contained the following items:  (1) an outside envelope; (2) a one-page cover letter; (3) a one-page document titled "MasterCard Pre-Qualified Acceptance Certificate"; (4) a folded insert titled "Introducing: the Tribute MasterCard" or "Introducing the Imagine MasterCard"; and (5) a two-sided document titled "Summary of Credit Terms" on one side and "Terms of Offer" on the other.

32.     A typical and illustrative direct mail solicitation package repeatedly and with bold emphasis used words and phrases like "pre-qualified," "no application fee," and "no deposit required."  The cover letter of the solicitation package stated that the consumer was pre-qualified for an unsecured Tribute MasterCard or Imagine MasterCard with a credit limit of $300.

33.     The solicitation failed to adequately disclose that consumers would be immediately billed the $150 annual fee, the $29 account opening fee, and for certain

7

EXHIBIT C - 7

solicitations, the $6.50 monthly maintenance fee. The solicitation package also did not adequately disclose that consumers would be required to make an initial payment before their Little Rock Card would be activated. For some solicitations, the package did not adequately disclose that once the card was used, a $6.50 monthly account maintenance fee would be charged to the account.

34. A typical and illustrative direct mail solicitation package manipulated the words used or omitted words, the placement and size of the text, and the overall arrangement of the solicitation packages to represent, expressly or by implication, that consumers were pre-approved to receive a credit card that had $300 in available credit.

35. These direct mail solicitation packages, when viewed as a whole, were deceptive in nature because they failed to adequately disclose the actual available credit, the fees and costs of the Little Rock Cards, and the impact of the fees and costs on the available credit.

36. The solicitation package instructed consumers who wished to obtain the Tribute MasterCard or the Imagine MasterCard to complete and return the "Acceptance Certificate," call a toll-free number, or respond over the Internet.

37. Upon the consumer's acceptance of the Little Rock Card direct mail solicitation offer, if the consumer was approved for the card, he or she was sent a fulfillment package.

38. The fulfillment package included the consumer's Little Rock Card that was not activated, a copy of the Bank Credit Card Agreement, and a payment coupon informing the consumer that an initial payment of $20 was required before the card could be activated and used. The package also listed a phone number the consumer could call

8

EXHIBIT C - 8

to pay the initial payment by telephone.  The $20 payment was applied against the consumer's Little Rock Card account balance.

39.    A typical and illustrative fulfillment package included in small type and on the reverse side of the credit card carrier information that there is an "annual fee," an "account opening fee," and a "monthly maintenance fee." This information was not as clear or prominent as, or in any proximity to, the representations about how to activate the card.

40.    The fulfillment package led consumers to believe that they were obligated to make only a $20 payment to activate the card, and did not disclose or disclosed inadequately that significant up-front fees had already been charged to their accounts.

### One Percent Minimum Payment Program for Past Due Accounts

### Little Rock Card

41.    At all times relevant to these proceedings, in numerous instances, the Bank and CompuCredit automatically, and with no prior notice, placed consumers who were more than 90 days delinquent on their Little Rock Card account into a payment reduction program known as the "1% Minimum Payment Program."

42.    At all times relevant to these proceedings, neither the payment reduction program, nor its terms and conditions, were adequately disclosed or explained to consumers prior to their being placed in the program.

43.    Under this program, consumers were allowed to pay either 1% of their outstanding balance or $10, whichever was greater.

44.    The Bank and CompuCredit represented, expressly or by implication, to

9

EXHIBIT C - 9

consumers whose accounts were more than 90 days past due that enrollment in this program would help them become current on their accounts.

45.    The Bank and CompuCredit failed to disclose the effects of the reduced minimum payments, including that such payments may not cover all the fees and charges assessed during the period of reduced minimum payments, resulting in an increase in the overall account balance and possibly the imposition of additional fees including, but not limited to, overlimit fees.

46.    By reason of the foregoing, the Bank and CompuCredit's failure to disclose, or failure to disclose adequately, material information regarding the 1% Minimum Payment Program was a deceptive act or practice in violation of Section 5.

47.    By reason of the acts and practices described in paragraphs 10 through 46, the Bank and CompuCredit violated Section 5 as follows:

(a)    The Bank and CompuCredit represented, expressly or by implication, that consumers were "pre-qualified" to receive a Little Rock Card with $300 of available credit by opening an account. In fact, consumers who responded to the solicitations and opened an account received only $114.50 or $121 of available credit due to the significant fees billed immediately to their accounts. Therefore, the Bank and CompuCredit's representations regarding the amount of credit that consumers would receive were false or misleading and a deceptive practice.

(b)    The Bank and CompuCredit represented, expressly or by implication, that consumers were "pre-qualified" to receive a credit card with $300 of available credit with "No deposit required," "No deposit fee," and "No application fee." The Bank and CompuCredit failed to disclose, or failed to disclose adequately, that

10

EXHIBIT C - 10

consumers would be charged substantial up-front fees, including an annual fee, an account opening fee, and a monthly maintenance fee. In light of the representations made, the Bank and CompuCredit's failure to disclose, or the failure to disclose adequately, the material information about the up-front fees that consumers would be charged, was a deceptive practice.

(c)     The Bank and CompuCredit represented, expressly or by implication, to consumers whose accounts were more than 90 days delinquent that enrollment in the 1% Minimum Payment Program would help them become current on their accounts. The Bank and CompuCredit failed to disclose the effects of the reduced minimum payments, including that such payments may not cover all fees and charges assessed during the period of reduced payments, resulting in an increase in the overall account balance and possibly the imposition of additional fees including, but not limited to, overlimit fees. The Bank and CompuCredit's failure to disclose this material information, or to disclose it adequately, was a deceptive practice.

48.     The actions alleged in paragraphs 9 through 47 above beginning in at least July 2005, represent the Bank and CompuCredit's violations of Section 5 related to the Little Rock Cards.

## II. Purpose Advantage Credit Card Program

49.     Beginning in at least September 2005, the Bank and CompuCredit, through its two subsidiaries, CARDS Credit Services, LLC and Purpose Solutions, LLC, marketed the Purpose Advantage credit card (Purpose Advantage) through the Internet as a "guaranteed", "pre-approved" credit card with a minimum credit limit of $50 and "no enrollment fees."

11

EXHIBIT C - 11

50. Beginning approximately September 2005, the Bank and CompuCredit originated more than 26,000 Purpose Advantage accounts.

51. The Internet solicitations for the Purpose Advantage card misled consumers into believing that they would receive a credit card with a guaranteed minimum amount of credit of $50 and that there were "no enrollment fees."

52. However, initial fees, typically consisting of an annual participation fee of $9.99 and a processing fee of $4.99, were charged to the consumer's account immediately after the consumer was approved to receive the Purpose Advantage credit card and before the consumer ever received and used the card.

53. The annual participation fee of $9.99 and the processing fee of $4.99 reduced the consumer's available credit from $50.00 to $35.02 before the consumer ever received and used the card.

### Deceptive Marketing Materials and Practices

54. At all times relevant to this proceeding, the Bank and CompuCredit, through its subsidiaries, CARDS Credit Services, LLC and Purpose Solutions, LLC, marketed the Purpose Advantage credit card over the Internet as a "guaranteed" "pre-approved" credit card with "no enrollment fees" and with a minimum credit limit of $50.

55. The Internet solicitation failed to disclose, or failed to adequately disclose, that the consumer would be immediately charged a $9.99 annual participation fee and a $4.99 account processing fee prior to receiving and ever using the card.

56. The Bank and CompuCredit's failure to disclose, or disclose adequately, the significant up-front fees in its solicitations described in paragraphs 49 through 55 was a deceptive practice in violation of Section 5.

12

EXHIBIT C - 12

## III.  The Embrace Visa Program

57.    At all times relevant to these proceedings, beginning in March 2006, the Bank and CompuCredit marketed the Embrace Visa card to consumers with unpaid debts that were charged off by prior creditors, including debts that were no longer subject to suit under the applicable statute of limitations and debts that were no longer being reported to consumer reporting agencies because they were outside the seven-year limitation set forth in section 605 of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681c.

58.    These unpaid debts had been previously purchased by Jefferson Capital Systems, LLC (Jefferson Capital), a wholly-owned subsidiary of CompuCredit.  Jefferson Capital is a limited liability company organized and existing under the laws of the state of Georgia with its principal place of business in St. Paul, Minnesota.

59.    As described below, the Embrace Visa card direct mail solicitations misled consumers into believing that they would immediately receive credit cards, with their prior debts transferred to the new cards and reported to consumer reporting agencies as paid in full.  In fact, consumers who applied for the Embrace Visa card entered into a debt repayment program.  Consumers did not qualify for a credit card until they paid between 25% - 50% of their charged off debt within a specified time frame, and even if they made the required payments, consumers would receive a nominal credit line.

60.    To market the Embrace Visa card, the Bank and CompuCredit arranged for consumers to receive direct mail solicitations from Jefferson Capital.  The Bank and CompuCredit, through Jefferson Capital, targeted consumers with charged off debt with principal balances between $200 and $10,000.  These direct mail solicitations included an

13

EXHIBIT C - 13

introductory letter from Jefferson Capital, the card offer letter, and a "Condensed Bank Credit Card Agreement."

61.    The Bank and CompuCredit used several versions of the Embrace Visa card solicitation, depending on the amount of the original charged off account balance. All of the direct mail solicitations offered consumers a "no annual fee unsecured credit card" and stated in bold type, "You're Pre-Approved for the Embrace Visa Card" or "You're Pre-Approved for the New Embrace Fresh Start Solution and Visa Card." The solicitations encouraged consumers to "Sign Up Today!" and proclaimed, "Soon you can enjoy all the convenience and benefits Visa has to offer."

62.    The Embrace Visa card direct mail solicitations informed consumers that Jefferson Capital "made an arrangement with the issuer of the Embrace Visa card to provide you with the opportunity to receive a no annual fee unsecured credit card." Consumers were also told that they were "Pre-Approved for the Embrace Visa Card." Consumers were not told that CompuCredit is both the parent company of Jefferson Capital and the company responsible for marketing the Embrace Visa card for the Bank.

63.    The Embrace Visa card solicitations included a letter from Jefferson Capital stating that the offer was "an opportunity to satisfy this debt and enjoy the convenience of a new Visa card." The solicitations represented to consumers that their charged off debt would be "transferred to a new Embrace Visa account as the first transaction on your new account." The solicitations further represented that "[a]s an added bonus, once you qualify to receive a Embrace Visa card, we will see to it that the credit bureaus are notified that your former account has been paid in full."

64.    These representations in the Embrace Visa card solicitations led

14

EXHIBIT C - 14

consumers to believe that: (a) they would immediately receive an Embrace Visa card upon acceptance of their "Pre-Approved" application; and (b) their charged off debt would be immediately transferred to an Embrace Visa card account and reported to consumer reporting agencies as "paid in full."

65.    In fact, consumers who received the Embrace Visa card solicitations were not "pre-approved" to receive a Visa credit card. Rather, the Embrace Visa card program was an attempt to collect consumers' charged off debt balances by enrolling consumers in a debt repayment plan and, in some instances, renewing both the statute of limitations and the credit reporting periods on consumers' charged off debt.

66.    Moreover, consumers' charged off debts were not transferred to a Embrace Visa card account "as the first transaction on [the] new account" or reported as "paid in full" when consumers responded to the solicitations. Instead, consumers were required to pay between 25% and 50% of their originally charged off debt within 12 months before the remaining balance was transferred to the Embrace Visa card account and the charged off debt was reported as paid in full. Only then did the consumer become eligible for the Embrace Visa card.

67.    Even if a consumer made sufficient payments to receive the Embrace Visa card, the available credit was typically only about 5% of the amount of the charged off debt balance that was transferred to the card. As a result, the Embrace Visa card provided the consumer with little utility for purchases or cash advances.

68.    By reason of the acts and practices described in paragraphs 9 through 20 and 57 through 67, the Bank and CompuCredit violated Section 5 as follows:

(a)    The Bank and CompuCredit represented, expressly or by

15

EXHIBIT C - 15

implication, that upon acceptance of a consumer's "Pre-Approved" application for an Embrace Visa card, the consumer would immediately receive an Embrace Visa card. In fact, upon acceptance of the consumer's pre-approved application, the Bank and CompuCredit did not immediately issue the consumer an Embrace Visa card. Rather, consumers were required to pay between 25% and 50% of their prior charged off debt before they would be eligible for an Embrace Visa card. The Bank and CompuCredit's representations about the immediate availability of a credit card were false or misleading and a deceptive practice.

(b)    The Bank and CompuCredit represented, expressly or by implication, that upon acceptance of a consumer's application for an Embrace Visa card, the consumer's charged off debt would be immediately transferred to the Embrace Visa card account and be reported to the credit reporting agencies as "paid in full," and the prior debt would be satisfied. In fact, upon acceptance of the consumer's application, the Bank and CompuCredit did not transfer a consumer's charged off debt to the card, report the debt as "paid in full" to the credit reporting agencies, or deem the prior debt as satisfied. Therefore, the representations of the Bank and CompuCredit about the prior charged off debt were false or misleading and a deceptive practice.

69.    The actions alleged in paragraphs 9 through 20 and 57 through 68 above beginning in at least March 2006, represent the Bank and CompuCredit's violations of Section 5 related to the Embrace Visa card program.

## VIOLATIONS OF SECTION 5 OF THE FEDERAL TRADE COMMISSION ACT

### (as to the Bank)

70.    Beginning in March 2006 and upon information and belief continuing

through the present, the Bank and Continental Finance have engaged in unfair or deceptive acts and/or practices in violation of Section 5 in connection with their credit card lending activities as more fully alleged below.

71. The Bank and Continental Finance are engaged in, and since at least March 2006 have been engaged in, the business of providing credit cards throughout the United States. Continental Finance offers these products and services by entering into a contract with the Bank, pursuant to which Continental Finance markets and services credit card products on behalf of the Bank.

72. On or about February 28, 2006, the Bank and Continental Finance entered into a Credit Card Marketing Agreement (Continental Affinity Agreement) providing for, among other things, the marketing and issuance of credit cards.

73. At all times relevant to this proceeding, there has been a Continental Affinity Agreement in place between the Bank and Continental Finance.

74. Pursuant to the Continental Affinity Agreement, the Bank issues the credit cards and owns the credit card accounts.

75. Since at least March 2006, the Bank and Continental Finance marketed credit cards throughout the United States under the brand names Gold MasterCard and Classic MasterCard (collectively, CFC Cards).

76. Under the Continental Affinity Agreement, the Bank must review and approve: (a) all marketing and solicitation materials such as development and placement of Internet, print media, radio and television advertising; (b) website design and development; (c) administrative materials; and (d) consumer materials including cardholder agreements and billing statements.

17

EXHIBIT C - 17

77.    As the credit card issuer and the account owner of the CFC Cards, the Bank was responsible for ensuring that the marketing and solicitation practices for these cards complied with all applicable laws, including Section 5.

78.    The Bank and Continental Finance marketed the CFC Cards through Internet solicitations and direct mail solicitations.

79.    As described below, the Internet solicitations and direct mail solicitations for the CFC Cards misled consumers into believing that they would receive a CFC credit card with $300 in available credit. The solicitations also failed to disclose adequately the significant up-front fees that consumers would be charged.

80.    From approximately March 2006 through March 2008, the Bank issued more than 240,000 CFC Cards to consumers who responded to these solicitations and there were more than 173,000 active accounts as of March 2008.

81.    The Bank and Continental Finance targeted consumers who had inadequate or poor credit histories and, consequently, limited credit options.

82.    The CFC Cards were marketed as a MasterCard credit card with an initial credit limit of typically $300 with low annual fees.

83.    However, initial fees, typically consisting of a set-up fee of $99, participation fee of $89, and an annual fee of $49 or $27 were charged and posted to the consumer's CFC Card account immediately after the consumer applied for and was issued a card.

84.    The Bank and Continental Finance also charged the consumer a monthly maintenance fee typically of $10.00. This fee was posted to the consumer's account immediately after the consumer was issued a card.

18

EXHIBIT C - 18

85.    The initial fees and charges of $247 or $225 for the CFC Cards reduced the consumer's available credit from $300 to $53 or $75 before the consumer ever used the card.

86.    The Bank and Continental Finance also represented in Internet and direct mail solicitations that a consumer would receive "credit limit increases"; however, they failed to disclose, or failed to disclose adequately, that: (a) the consumer would be automatically charged $25 for each credit limit increase of $100, which could only occur twice a year; and (b) the consumer could "opt out" of the credit limit increase and thereby, avoid the charge; and (c) failure to "opt out" would result in the automatic imposition of a $25 charge for the $100 credit limit increase.

87.    The Bank and Continental Finance also represented in Internet and direct mail solicitations that a consumer would receive "FREE Online Account Access and Tools"; however, they failed to disclose, or failed to disclose adequately, that a consumer would have to pay $4 for making an account payment over the Internet.

### Deceptive Marketing Materials and Practices

88.    At all times relevant to this proceeding, the Bank and Continental Finance marketed CFC Cards by Internet solicitations and by sending consumers direct mail solicitation letters.

89.    A typical and illustrative Internet solicitation and direct mail solicitation marketed the CFC Cards as having low annual fees, free online account access and tools, and frequent credit limit increases. In different versions of the solicitations, one or more of the initial fees were not disclosed or were inadequately disclosed.

90.    The Internet solicitation and direct mail solicitations failed to adequately

19

EXHIBIT C - 19

disclose that consumers would be immediately billed the $99 account set-up fee, $89 program participation fee, and the $27 or $49 annual fee depending on the credit card selected, and the $10 monthly maintenance fee.

91.    A typical and illustrative Internet solicitation and direct mail solicitation manipulated the words used or omitted words, the placement and size of the text, and the overall arrangement of the Internet solicitation and direct mail solicitation to represent, expressly or by implication, that consumers who were approved would receive a credit card that had $300 in available credit.

92.    These Internet and direct mail solicitations, when viewed as a whole, were deceptive in nature because they failed to disclose, or disclosed inadequately, the actual available credit, the fees and costs of the CFC Cards, and the impact of the fees and costs on the available credit.

93.    These Internet and direct mail solicitations failed to disclose, or disclosed inadequately, that significant up-front fees would be charged to a consumer's account.

94.    These Internet and direct mail solicitations failed to disclose, or disclosed inadequately, that a consumer would be automatically charged $25 for each credit increase of $100, which could only occur twice a year, that the consumer could "opt out" of such credit increases, and that failure to "opt out" would result in the automatic imposition of the $25 fee for the $100 credit increase.

95.    These Internet and direct mail solicitations failed to disclose, or disclosed inadequately, that a consumer would have to pay $4 for making an account payment over the Internet.

96.    By reason of the acts and practices described in paragraphs 70 through

20

EXHIBIT C - 20

95, the Bank violated Section 5 as follows:

(a)    The Bank represented, expressly or by implication, that consumers would receive a CFC Card with $300 of available credit.  In fact, consumers who responded to the solicitations and opened an account received only $53 or $75 of available credit due to the significant fees billed immediately to their accounts. Therefore, the Bank's representations regarding the amount of credit that consumers would receive were false or misleading and a deceptive practice.

(b)    The Bank represented, expressly or by implication, that consumers would receive a credit card with $300 of available credit with a "low annual fee," "free online account access and tools," and "credit limit increases."  The Bank failed to disclose, or failed to disclose adequately, that consumers would be charged significant up-front fees, including an account set-up fee, annual fee, account opening fee, and a monthly maintenance fee.  The Bank also failed to disclose, or disclosed inadequately, the credit line increase fee, including the "opt out" procedures, and the online account payment fee.  In light of the representations made, the Bank's failure to disclose, or the failure to disclose adequately, the material information about the up-front fees that the consumer would be charged, and the failure to disclose, or failure to disclose adequately, the credit line increase fee of $25, including the "opt out" procedures, and the online account payment fee of $4 were deceptive practices.

97.    The actions alleged in paragraphs 70 through 96 above continued from at least March 2006 through, upon information and belief, to the present, and represent the Bank's violations of Section 5 related to the CFC Cards.

21

EXHIBIT C - 21

## VIOLATIONS OF OTHER LAWS AND REGULATIONS

### (as to the Bank only)

98.     The Bank has been operating in violation of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693 *et seq.* (EFT Act) and Regulation E of the Board of Governors of the Federal Reserve, 12 C.F.R. Part 205 (Regulation E).  The EFT Act and Regulation E prohibit, among other things, the conditioning of an extension of credit to a consumer on the consumer's repayment by preauthorized recurring electronic funds transfers unless pursuant to an overdraft credit plan or to maintain a specified minimum balance in the consumer's account.  Creditors may offer a program with a reduced annual percentage rate or other cost-related incentive for an automatic electronic repayment feature, if the program requiring the automatic electronic repayment is not the only program offered for the type of credit involved.

99.     Two ILPs offered by the Bank, the Purpose ILP and the Check'n Go ILP, required repayment by electronic fund transfer on a preauthorized recurring basis in violation of the EFT Act and Regulation E.  The Internet website for the Purpose ILP, the primary source of applications for this ILP, identified preauthorized recurring electronic fund transfers as the sole means of repayment and no other options were disclosed.  The website for the Check'n Go ILP repeatedly advised applicants that they could borrow up to $1,500; however, this amount was only available to consumers repaying the loan by electronic fund transfer on a preauthorized recurring basis.  If a consumer elected to repay via a remotely created check they could only borrow up to $200.  This difference in the "up to" amount does not constitute the type of cost-related incentive contemplated by Regulation E.  The "up to" $1,500 Check'n Go ILP conditioned on repayment by

22

EXHIBIT C - 22

electronic fund transfer on a preauthorized recurring basis therefore violated the EFT Act and Regulation E.

100.    Part 332 of the FDIC's Rules and Regulations, 12 C.F.R. Part 332, implementing the consumer privacy safeguards of the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 *et seq.* (Part 332) prohibits financial institutions from disclosing any nonpublic, personal information about a consumer to nonaffiliated third parties unless, the consumer was provided a notice and an opportunity to opt-out and the consumer did not opt-out.

101.    The Little Rock Cards' online applications automatically authorized the Bank to forward the consumer's name and address to a third party.  The online application also allows the Bank to forward to third parties:  the application information, any credit report information, and any other information gathered and considered as part of the application for the Little Rock Cards.

102.    The Bank failed to provide the customer with an opt-out notice giving the customer the opportunity to opt-out of this sharing arrangement.  Additionally, the only way that the consumer could avoid sharing personal information was to not apply for the credit product.

103.    Part 332 also requires financial institutions to provide a clear and conspicuous initial notice that accurately reflects its privacy policies and practices to any individuals who become their customer.

104.    The Bank failed to ensure that customer information was protected from other parties.  Two other FDIC regulated institutions have contractual relationships with CompuCredit.  The computer system utilized by CompuCredit, the Bank, and the other

23

EXHIBIT C - 23

two institutions did not include proper firewalls to prohibit credit card staff from viewing the customer accounts at any of the three banks.

105.    By failing to provide their customers with an opportunity to opt-out of the information sharing, the required privacy notice, or a properly secure computer system for storing personal information, the Bank violated Part 332.

106.    The Bank has been operating in violation of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.* (ECOA) and Regulation B of the Board of Governors of the Federal Reserve System,12 C.F.R. Part 202 *et seq.* (Regulation B).  ECOA and Regulation B prohibit creditors from discriminating against an application in any aspect of a credit transaction on the basis that the applicant, in good faith, exercised any right under the Consumer Credit Protection Act , 15 U.S.C. § 1501 *et seq.*

107.    The Bank had measures in place to automatically decline applicants for ILPs who had placed fraud or active duty alerts on their credit reports resulting in an automatic credit denial based upon an applicant's valid exercise of their rights under the Consumer Credit Protection Act and the violation of ECOA and Regulation B.

108.    The Bank has been operating in violation of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* (FCRA).  FCRA requires, among other things, that a financial institution contact any consumer requesting a fraud or active duty alert be placed on their consumer report and specifying a telephone number to be used for identify verification purposes be contacted at that number before authorizing a new credit plan or extension of credit.

109.    The Bank's practice of requiring an applicant who placed a fraud or active duty alert on their consumer report to contact the Bank to continue the application

24

EXHIBIT C - 24

process rather than contacting the consumer at their specified telephone number violated FCRA.

110.    The Bank has been operating in violation of the E-Sign Act, 15 U.S.C. §§ 7001 *et seq*. (E-Sign Act) and Regulation Z of the Board of Governors of the Federal Reserve System, 12 C.F.R. Part 226 (Regulation Z). Regulation Z requires, among other things, that financial institutions comply with the E-Sign Act when providing required written disclosures to consumers by electronic communication. The E-Sign Act requires, among other things, that consumers consent to the receipt of disclosures electronically and that prior to providing such consent the consumer be provided notice that they have the right to receive the disclosure in a non-electronic format or on paper, the right to withdraw their consent to electronic communications and any conditions, consequences or fee for such withdrawal.

111.    The Bank's Imagine MasterCard and its Purpose Prepaid MasterCard required consumers to agree to receive all communication electronically, including, but not limited to disclosures, periodic statements, amendments and collection efforts without providing the disclosures required by the E-Sign Act and Regulation Z resulting in violations of the E-Sign Act and Regulation Z.

112.    The Bank has been operating in violation of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (CAN-SPAM Act), 15 U.S.C. §§ 7701 *et seq*. The CAN-SPAM Act prohibits, among other things, the use of false or misleading header information in an electronic mail message (e-mail) such as a "from" line that does not accurately identify the initiator of the message, the use of deceptive subject headings and requires a clear and conspicuous identification that the e-mail

25

EXHIBIT C - 25

message is an advertisement or solicitation.

113.    The Bank's e-mail solicitations for its Imagine MasterCard failed to comply with the CAN-SPAM Act in that the initiator of the message was not accurately identified, the subject line did not accurately reflect the purpose of the contact and the e-mail message did not indicate in a clear and conspicuous manner that it was a solicitation.

## UNSAFE OR UNSOUND PRACTICES

### (as to the Bank only)

114.    The FDIC Compliance Examiners examined the Bank and issued a Compliance Report and Community Reinvestment Act Performance Evaluation as of April 6, 2006 (Compliance Report). The FDIC Risk Management Examiners subsequently examined the Bank and issued the April 25, 2007 Report of Examination (ROE) utilizing financial information as of March 31, 2007.

115.    Since at least 2005, the Bank has, through its National Consumer Products Division (NCP Division), engaged in lending programs offered, marketed, administered, processed, serviced and/or collected by third-parties pursuant to arrangements or agreements with the Bank including but not limited to those third party arrangements and agreements identified in Exhibit "A" attached hereto and incorporated herein by reference (all collectively referred to in this NOTICE as "third-party lending programs"; the third party providing one or more of these functions shall be referred to in this NOTICE as "third-party providers").

116.    The NCP Division's third-party lending programs include four third-party providers offering ILPs, two third-party providers offering subprime credit cards, a third-party provider offering an affinity credit card for financing dental expenditures, a third-

26

EXHIBIT C - 26

party provider offering an affinity credit card predicated on advancing a percent of the enrolled employee's annual wages, two third-party providers offering life insurance premium products and five third-party providers offering stored value cards.

117.    The ROE reflects that as of March 31, 2007, the aggregate dollar volume of the NCP Division's outstanding loans and unfunded commitments are $287.8 million, ten times the Bank's capital.  As of September 30, 2007, the aggregate dollar volume the NCP Division's outstanding loans and unfunded commitments had increased to $667.3 million, twenty-one times the Bank's capital.

118.    The Bank has engaged in unsafe and unsound banking practices in that the Bank has been operating its NCP Division without effective oversight by the Bank's board of directors (Board) and without adequate supervision by the Bank's senior management of the NCP Division's third-party lending programs and third-party providers it utilizes.  The inadequacies of Board's oversight and senior management's supervision include, but are not limited to, the following:

(a)    Despite the regulatory concerns expressed in four consecutive examinations of the Bank, the Board and senior management continue to allow the NCP Division to operate without adequate policies and procedures, without an adequate internal audit program, without an adequate management information system, without adequate internal controls and without fully implementing commitments made to the FDIC for remediation of previously identified deficiencies and to continue to expand existing third-party lending programs and to offer new third-party lending programs with new and existing third-party providers that do not conform with regulatory pronouncements and consumer protection laws and regulations;

27

EXHIBIT C - 27

(b)     Board meeting minutes and packages do not reflect satisfactory review, due diligence, risk assessment and consideration of compliance issues prior to the initiation of new third-party programs and/or regular review, due diligence, risk assessment and consideration of compliance issues once a new third-party program is launched;

(c)     The risk management program established by Board and senior management is fragmented and ineffective.  The Board and senior management have not established clear lines of responsibility and accountability for detailed due diligence, risk assessment and compliance with consumer protection laws and regulations of each third-party lending program and third-party provider prior to the initiation of new third-party lending programs, for regular detailed due diligence, risk assessment and compliance with consumer protection laws and regulations of each third-party lending program and third-party provider once a third-party lending program is launched or for an overall risk assessment of the NCP Division;

(d)     The infrastructure of the risk management program established by the Board and senior management for the NCP Division is insufficient in light of the rapid expansion of the NCP Division, the complexity of its operations and the risk inherent with each third-party provider and each third-party lending program;

(e)     Capital planning by the Board and senior management does not restrict or limit aggregate third-party lending programs in relation to capital or satisfactorily address or plan for the impact on capital the rapid growth of the NCP Division's third-party lending programs may have; and

(f)     The Board and senior management have not retained a sufficient

28

EXHIBIT C - 28

number of appropriately trained staff for the NCP Division.

119.    The Bank has engaged in unsafe and unsound banking practices in that the Bank has been operating its NCP Division with an inadequate system of internal controls with regard to the size of the NCP Division and the nature, scope and risk of the third-party lending programs and third-party providers in contravention of the Standards for Safety and Soundness contacted in Appendix A to Part 362, 12 C.F.R. Part 364.  The inadequacies of the Bank's internal controls include, but are not limited to, the following:

(a)    The NCP Division's organizational structure and reporting lines do not establish clear lines of authority and responsibility for:  (i) oversight of each third-party lending program and each third-party provider; (ii) assessing and monitoring each third-party lending program and each third-party provider for compliance with all applicable federal consumer protection laws and all implementing rules and regulations, regulatory guidance, statements of policies as well as all applicable policies and procedures of the Bank; or (iii) reporting the results of such assessments and monitoring activity to the Board;

(b)    The NCP Division's risk assessment process is ineffective in identifying, assessing, managing, controlling and reporting to the Board and senior management the strategic, legal, reputational, operational, transactional, compliance, regulatory, accounting and credit risk associated with each third-party lending program and each third-party provider; and

(c)    The NCP Division has not retained a sufficient number of appropriately trained staff to perform satisfactory risk assessment and monitoring of its third-party lending programs and third-party providers.

120.    The Bank has engaged in unsafe and unsound banking practices in that the Bank has been operating its NCP Division with an inadequate management information system (MIS) with regard to the size of the NCP Division and the nature, scope and risks of third-party lending programs and third-party providers in contravention of the Standards for Safety and Soundness contained in Appendix A to Part 364, 12 C.F.R. Part 364.  The inadequacies of the MIS include, but are not limited to the following:

(a)     The MIS does not collect, analyze or retain information necessary to allow the Bank to ascertain whether a lending transaction represents a fair exchange of value for the borrower, whether the pricing of the loan appropriately reflects the borrower's risk of repayment, whether the pricing is customary and reasonable under the circumstances and therefore whether the Bank is in compliance with the guidance set forth in the *FDIC's Supervisory Policy on Predatory Lending*, FIL-6-2007 (January 22, 2007);

(b)     The MIS does not collect, analyze or retain information necessary to appropriately monitor each third-party lending program or each third-party provider;

(c)     The MIS does not collect, analyze or retain information necessary to conduct trend analysis of each third-party lending program or each third-party provider for performance, utilization or delinquencies and charge-offs;

(d)     The MIS does not collect, analyze or retain information necessary to appropriately monitor each third-party lending program or each third-party provider for compliance with all federal consumer protection laws and all implementing rules and regulations, regulatory guidance and statements of policy as well as all applicable policies and procedures of the Bank; and

(e)     The NCP Division has not retained a sufficient number of

30

EXHIBIT C - 30

appropriately trained MIS staff.

121.    The Bank has engaged in unsafe and unsound banking practices in that the Bank has been operating its NCP Division with an inadequate internal audit system with regard to the size of the NCP Division and the nature, scope and risks of the third-party lending programs and third-party providers in contravention of the Standards for Safety and Soundness contained in Appendix A to Part 364, 12 C.F.R. Part 364.  The inadequacies of the Bank's internal audit system include, but are not limited to the following:

(a)    Insufficient internal audit staffing levels;

(b)    Lack of specific internal audit plans for each third-party lending program and third-party provider that ensure that the scope and testing are adequate to (i) detect substantive deficiencies in the operation of the lending program (including reconcilement and settlement procedures); (ii) determine the lending program's level of compliance with all applicable federal consumer protection laws and all implementing rules and regulations, regulatory guidance and statements of policy as well as all applicable policies and procedures of the Bank; and (iv) determine the financial condition of each third-party provider and its ability to meet its financial obligations and commitments to the Bank;

(c)    An insufficient internal audit schedule;

(d)    Audit reports which are not comprehensive and do not reflect reviews and comments on third-party lending programs and third-party providers;

(e)    The Compliance Self Assessment Program, adopted in 2006, is not customized to address each third-party lending program and third-party provider; and

31

EXHIBIT C - 31

(f)    Audit Committee meetings are structured to allow inside directors and senior management to attend and participate in every meeting.

122.    The Bank has engaged in unsafe and unsound banking practices in that the Bank has been operating its NCP Division with an inadequate compliance management system to ensure compliance with all federal consumer protection laws, including, but not limited to Section 5, and all implementing rules and regulations, regulatory guidance and statements of policy as well as all applicable policies and procedures of the Bank. The inadequacies of the Bank's compliance management system include, but are not limited to, the following:

(a)    Policies and procedures with respect to third-party lending programs and third-party providers do not satisfactorily provide for oversight, monitoring and auditing, including, but not limited to, initial and periodic review of solicitation materials, disclosures and/or advertisements, monitoring and auditing the third-party providers' collection, customer service and telemarketing centers;

(b)    Failure to fully implement the audit procedures and compliance consultant services of the Bank's Compliance Management Policy;

(c)    Failure to periodically review and enhance the Bank's Compliance Management Policy to satisfactorily address new third-party lending programs and third-party providers;

(d)    The NCP Division has not retained a sufficient number of appropriately trained compliance staff; and

(e)    The NCP Division has not satisfactorily trained existing compliance staff with respect to applicable federal consumer protection laws, including,

32

EXHIBIT C - 32

but not limited to, Section 5, and all implementing rules and regulations, regulatory guidance and statements of policy, applicable policies and procedures of the Bank and its third-party lending programs and third-party providers.

123.    The Bank engaged in unsafe and/or unsound banking practices by operating without policies, practices, or systems that comply with the following policies and guidelines:

(a)    *Account Management and Loss Allowance Guidance for Credit Card Lending*, FIL-2-2003 (January 8, 2003);

(b)    *Uniform Retail Credit Classification and Account Management Policy*, FIL-40-2000 (June 29, 2000);

(c)    *Interagency Statement on the Purchase and Risk Management of Life Insurance*, FIL-127-2004 (December 7, 2004);

(d)    *Overdraft Protection Programs Joint Agency Guidance*, FIL-11-2005 (February 18, 2005); and

(e)    *Unfair or Deceptive Acts or Practices by State-Chartered Banks*, FIL-26-2004 (March 11, 2004).

124.    Each of the unfair or deceptive acts and practices described in paragraphs 9 through 97 above are also unsafe and/or unsound banking practices within the meaning of section 8(b)(1) of the FDI Act, 12 U.S.C. § 1818(b)(1).

125.    Each of the violations of law, rules, or regulations described in paragraphs 98 through 123 above are also unsafe and/or unsound banking practices within the meaning of section 8(b)(1) of the FDI Act, 12 U.S.C. § 1818(b)(1).

126.    By reason of the violations of law and the unsafe and/or unsound

33

EXHIBIT C - 33

banking practices alleged in paragraphs 9 through 123 above, especially the violations of Section 5, the Bank engaged in and is currently engaging in unsafe and/or unsound banking practices by failing to provide effective oversight and supervision of its third party service providers.

## RESTITUTION

### (as to the Bank and CompuCredit)

127.    Each of the unfair or deceptive acts and practices described in paragraphs 9 through 56 above resulted in unjust enrichment to the Bank and CompuCredit within the meaning of 12 U.S.C. § 1818(b)(6).

128.    Each of the unfair or deceptive acts and practices described in paragraphs 9 through 56 above involved a reckless disregard for the law within the meaning of 12 U.S.C. § 1818(b)(6).

129.    As a result of the conduct described in paragraphs 9 through 56 above, consumers were aggrieved in an amount not presently ascertainable, but likely to exceed $35 million.

## RESTITUTION

### (as to the Bank)

130.    Each of the unfair or deceptive acts and practices described in paragraphs 70 through 97 above, resulted in unjust enrichment to the Bank within the meaning of 12 U.S.C. § 1818(b)(6).

131.    Each of the unfair or deceptive acts and practices described in paragraphs 70 through 97 above, involved a reckless disregard for the law within the meaning of 12 U.S.C. § 1818(b)(6).

132.    As a result of the conduct described in paragraphs 70 through 97 above, for all CFC Card consumer accounts that were opened from inception of the CFC Card program and continuing through the present, the Bank shall provide restitution to aggrieved consumers in an amount not presently ascertainable, but shall include in the form of reimbursement the following fees, charges and costs:  (a) initial account set-up fee of $99; (b) program participation fee of $89; (c)  first account annual fee charged of $49 or $27 depending on the type of account;  (d) all monthly maintenance fees in the amount of $10 charged within the first twelve billing cycles of the account; (e)  first two credit increase charges billed in the amount of $50; and (f) all fees charged within the first twelve billing cycles of the account for Internet transactions executed by the consumer.

## NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES, FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER TO PAY; AND NOTICE OF HEARING

133.    The FDIC incorporates the allegations of paragraphs 1 through 132 as FINDINGS OF FACT AND CONCLUSIONS OF LAW for purposes of this NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES (NOTICE OF ASSESSMENT) as though fully set out herein.

## ORDER TO PAY – FIRST BANK OF DELAWARE

134.    By reason of the violations of law set forth in the NOTICE OF ASSESSMENT, the FDIC has concluded that a civil money penalty should be assessed against the Bank pursuant to section 8(i)(2) of the FDI Act, 12 U.S.C. § 1818(i)(2).  After taking into account the appropriateness of the penalties with respect to the size of the financial resources and good faith of the Bank, the gravity of the violations, the history of

35

EXHIBIT C - 35

previous violations, and such other matters as justice may require, it is:

ORDERED that by reason of the violations set forth in the NOTICE OF ASSESSMENT, a penalty of Three Hundred and Four Thousand Dollars ($304,000) be, and hereby is, assessed against the Bank pursuant to section 8(i)(2) of the FDI Act, 12 U.S.C. § 1818(i)(2);

FURTHER ORDERED, that the effective date of this ORDER TO PAY be, and hereby is, stayed with respect to the Bank until 20 days after the date of service of the NOTICE OF ASSESSMENT on the Bank, during which time the Bank may file an answer and request a hearing pursuant to section 8(i)(2)(H) of the FDI Act, 12 U.S.C. § 1818(i)(2)(H), and section 308.19 of the FDIC's Rules of Practice and Procedure, 12 C.F.R. § 308.19.

135.    The Bank must specifically request a hearing within 20 days of service of the NOTICE OF ASSESSMENT on the Bank pursuant to section 8(i)(2)(H) of the FDI Act, 12 U.S.C. § 1818(i)(2)(H), and section 308.19 of the FDIC's Rules of Practice and Procedure, 12 C.F.R. § 308.19.   If the Bank fails to request a hearing within 20 days of service of this NOTICE OF ASSESSMENT, the penalty assessed against the Bank pursuant to the ORDER TO PAY will be final and unappealable and shall be paid within 60 days after the date of service of this NOTICE OF ASSESSMENT on the Bank.

136.    In the event the Bank requests a hearing, the Bank shall also file an answer to the charges in the NOTICE OF ASSESSMENT within 20 days of service of the NOTICE OF ASSESSMENT on the Bank in accordance with section 308.19 of the FDIC's Rules of Practice and Procedure, 12 C.F.R. § 308.19.

36

EXHIBIT C - 36

## ORDER TO PAY – COMPUCREDIT

137.    By reason of the violations of law set forth in the NOTICE OF ASSESSMENT, the FDIC has concluded that a civil money penalty should be assessed against CompuCredit pursuant to section 8(i)(2) of the FDI Act, 12 U.S.C. § 1818(i)(2). After taking into account the appropriateness of the penalties with respect to the size of the financial resources and good faith of CompuCredit, the gravity of the violations, the history of previous violations, and such other matters as justice may require, it is:

ORDERED that by reason of the violations set forth in the NOTICE OF ASSESSMENT, a penalty of Eight Hundred and Six Thousand Dollars ($806,000) be, and hereby is, assessed against CompuCredit pursuant to section 8(i)(2) of the FDI Act, 12 U.S.C. § 1818(i)(2);

FURTHER ORDERED, that the effective date of this ORDER TO PAY be, and hereby is, stayed with respect to CompuCredit until 20 days after the date of service of the NOTICE OF ASSESSMENT on CompuCredit, during which time CompuCredit may file an answer and request a hearing pursuant to section 8(i)(2)(H) of the FDI Act, 12 U.S.C. § 1818(i)(2)(H), and section 308.19 of the FDIC's Rules of Practice and Procedure, 12 C.F.R. § 308.19.

138.    CompuCredit must specifically request a hearing within 20 days of service of the NOTICE OF ASSESSMENT on CompuCredit, pursuant to section 8(i)(2)(H) of the FDI Act, 12 U.S.C. § 1818(i)(2)(H), and section 308.19 of the FDIC's Rules of Practice and Procedure, 12 C.F.R. § 308.19.  If CompuCredit fails to request a hearing within 20 days of service of this NOTICE OF ASSESSMENT, the penalty assessed against CompuCredit pursuant to the ORDER TO PAY will be final and unappealable

37

EXHIBIT C - 37

and shall be paid within 60 days after the date of service of this NOTICE OF ASSESSMENT on CompuCredit.

139.    In the event CompuCredit requests a hearing, CompuCredit shall also file an answer to the charges in the NOTICE OF ASSESSMENT within 20 days of service of the NOTICE OF ASSESSMENT on CompuCredit, in accordance with section 308.19 of the FDIC's Rules of Practice and Procedure, 12 C.F.R. § 308.19.

## NOTICE OF HEARING

140.    Notice is hereby given that a hearing will be held in Wilmington, Delaware, commencing 60 days from the date of service of the NOTICE OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND FOR RESTITUTION, or on such date and at such place as may be set by the Administrative Law Judge appointed to hear the matter, for the purpose of taking evidence on the charges specified in the NOTICE OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND FOR RESTITUTION and to determine whether an appropriate order should be issued under the FDI Act requiring the Bank and CompuCredit to:

(a)    cease and desist from the unsafe or unsound banking practices and violations of law specified therein; and

(b)    take affirmative action to correct the conditions resulting from such practices and violations, including making restitution and/or providing reimbursement to affected consumers.

141.    If the Bank or CompuCredit requests a hearing with respect to the charges specified in the NOTICE OF ASSESSMENT, evidence shall also be taken on the charges specified therein at the same time and place for the purpose of determining whether the

38

EXHIBIT C - 38

Bank shall be ordered to forfeit and pay a civil money penalty in accordance with section 8(i)(2) of the FDI Act, 12 U.S.C. § 1818(i)(2).

142.    The hearing will be held before an Administrative Law Judge to be appointed by the Office of Financial Institution Adjudication pursuant to 5 U.S.C. § 3105. The hearing will be public, and in all respects will be conducted in compliance with the FDI Act, the Administrative Procedures Act, 5 U.S.C. §§ 551 - 559, and the FDIC's Rules of Practice and Procedure, 12 C.F.R. Part 308.

143.    The Bank and CompuCredit are each directed to file an answer to the NOTICE OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND FOR RESTITUTION within 20 days from the date of service on the Bank or CompuCredit, as provided in 12 C.F.R. § 308.19 of the FDIC Rules of Practice and Procedure.

144.    The original and one copy of all papers filed or served in this proceeding shall be filed with the Office of Financial Institution Adjudication, 1700 G Street, N.W., Washington, D.C. 20552, pursuant to section 308.10 of the FDIC Rules of Practice and Procedure, 12 C.F.R. § 308.10. Copies of all papers filed or served in this proceeding shall be served upon Robert Feldman, Executive Secretary, Federal Deposit Insurance Corporation, 550 17th Street, N.W. (F-1058), Washington, D.C. 20429-9990; A.T. Dill III, Senior Counsel, Enforcement Unit, Legal Division, Federal Deposit Insurance Corporation, 550 17th Street, N.W. (MB-3124), Washington, D.C. 20429-9990; and Stephen L. Rodgers, Acting Regional Counsel (Supervision), Federal Deposit Insurance Corporation, 20 Exchange Place, New York, New York 10005.

Pursuant to delegated authority.

Dated this 10ᵗʰ day of June, 2008.

_____
Sandra L. Thompson
Director
Division of Supervision and Consumer Protection

40

EXHIBIT C - 40

**EXHIBIT A**

1. Amended and Restated Affinity Card Agreement dated as of March 13, 2006 between CompuCredit Corporation and First Bank of Delaware;

2. Amended and Restated Installment Loan Marketing and Servicing Agreement dated as of September 20, 2006 (made effective as of August 23, 2006) between Noble Consumer Lending Services, LLC and First Bank of Delaware;

3. Credit Card Marketing and Servicing Agreement dated as of August 31,2005 between First Bank of Delaware and CARDS Credit Services, LLC;

4. Credit Card Marketing Agreement dated as of February 28, 2006 by and among Continental Finance Company, LLC, Continental Sub-Prime Purchasing, LLC and First Bank of Delaware, and the Amended and Restated Receivables Purchase Agreement dated as of May 17, 2006 by and among First Bank of Delaware, Continental Finance Company, LLC, and Continental Sub-Prime Purchasing, LLC;

5. Credit Card Marketing Agreement dated as of January 18, 2007 between Accucredit Associates, LLC and First Bank of Delaware and the Receivables Purchase Agreement dated January 17, 2007 between Accucredit Associates, LLC and First Bank of Delaware;

6. Credit Card Marketing Agreement dated as of September 29, 2006 between E-Duction, Inc. and First Bank of Delaware and the Receivables Purchase Agreement dated September 29, 2006 between First Bank of Delaware and E-Duction Receivables Funding I, LLC;

7. Installment Loan Marketing and Servicing Agreement dated as of November 1, 2006 between Avante Teladvance, Inc. d/b/a Check 'n Go Online and First Bank of Delaware;

8. Consumer Loan Marketing, Origination, and Sale Agreement dated as of January 15, 2007 between CashCall, Inc. and First Bank of Delaware;

9. Marketing and Servicing Agreement dated as of January 23, 2007 between TC Loan Service, LLC d/b/a ThinkCash and First Bank of Delaware and the Master Participation Agreement dated as of January 23, 2007 between TC Financial, LLC and First Bank of Delaware;

10. Program Administration Agreement dated as of November 1, 2006, between First Bank of Delaware and Fortris Financial, LLC and PF Participation Funding Trust; Master Participation Agreement dated as of November 1, 2006 between First Bank of Delaware and Fortris Financial, LLC and PF

41

EXHIBIT C - 41

Participation Funding Trust; and the Sub-Servicing Agreement dated as of November 1, 2006 between Fortris Financial, LLC and First Bank of Delaware;

11. Premium Finance Program Agreement dated as of August 23, 2006 between First Delaware Services LLC and First Bank of Delaware;

12. Processor Sponsorship and Services Agreement dated as of April 17, 2006 between Card Express, Inc. and First Bank of Delaware;

13. Processor Sponsorship and Services Agreement dated as of August 26, 2005 between TSYS Prepaid, Inc. and First Bank of Delaware;

14. Processor Sponsorship and Services Agreement dated as of April 5, 2006 between ECOM Financial Corp. and First Bank of Delaware;

15. Program Management Agreement dated July 30, 2004 between Financial Services International, Inc. and First Bank of Delaware;

16. Processor Servicing Agreement dated as of October 5, 2004 between Lynk Systems, Inc. and First Bank of Delaware.

42

EXHIBIT C - 42