# Exhibit D

# FEDERAL DEPOSIT INSURANCE CORPORATION

## WASHINGTON, D. C.

| | |
|---|---|
| In the Matter of ) | NOTICE OF CHARGES |
| ) | FOR AN ORDER TO |
| FIRST BANK & TRUST ) | CEASE AND DESIST AND |
| BROOKINGS, SOUTH DAKOTA ) | FOR RESTITUTION; |
| ) | NOTICE OF |
| (Insured State Nonmember Bank) ) | ASSESSMENT OF CIVIL |
| ) | MONEY PENALTIES; |
| And ) | FINDINGS OF FACT AND |
| ) | CONCLUSIONS OF LAW; |
| COMPUCREDIT CORPORATION ) | ORDER TO PAY; AND |
| ATLANTA, GEORGIA ) | NOTICE OF HEARING |
| An Institution-Affiliated Party of: ) | |
| ) | |
| FIRST BANK & TRUST ) | FDIC-07-228b |
| BROOKINGS, SOUTH DAKOTA ) | FDIC-07-260k |
| ) | |
| (Insured State Nonmember Bank) ) | |

The Federal Deposit Insurance Corporation (FDIC), being of the opinion that First Bank & Trust, Brookings, South Dakota (Bank) and CompuCredit Corporation, Atlanta, Georgia (CompuCredit), an institution-affiliated party of the Bank, have engaged in violations of law and/or regulations and in unsafe and/or unsound banking practices and, unless restrained, the Bank and CompuCredit will continue to engage in such practices and violations in conducting the business of the Bank, hereby institutes this proceeding to determine whether appropriate orders should be issued against the Bank and CompuCredit under the provisions of sections 8(b)(1), 8(b)(6), and 8(i) of the Federal Deposit Insurance Act (FDI Act), 12 U.S.C. §§ 1818(b)(1), 1818(b)(6), and 1818(i). The FDIC hereby issues this NOTICE OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND FOR RESTITUTION; NOTICE OF ASSESSMENT OF CIVIL MONEY

EXHIBIT D - 1

PENALTIES, FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER TO PAY; AND NOTICE OF HEARING (collectively, NOTICE) pursuant to the provisions of the FDI Act, 12 U.S.C. §§ 1811-1831aa, and the FDIC's Rules of Practice and Procedures, 12 C.F.R. Part 308, and alleges as follows:

## JURISDICTION

1.      The Bank is, and at all times relevant to this proceeding has been, a corporation organized, existing, and doing business under the laws of the State of South Dakota with its principal place of business in Brookings, South Dakota.

2.      The Bank is, and at all times relevant to this proceeding has been, a "State nonmember bank" within the meaning of section 3(e)(2) of the FDI Act, 12 U.S.C. § 1813(e)(2); an "insured depository institution" within the meaning of section 3(c)(2) of the FDI Act, 12 U.S.C. § 1813(c)(2); and subject to the FDI Act, 12 U.S.C. §§ 1811-1831aa, the FDIC's Rules and Regulations, 12 C.F.R. Chapter III, and the laws of the State of South Dakota.

3.      CompuCredit is, and at all times relevant to this proceeding has been, a corporation organized, existing, and doing business under the laws of the state of Georgia, and has its principal place of business in Atlanta, Georgia.

4.      Since at least March 2, 2005, pursuant to a contractual arrangement, the Bank and CompuCredit have conducted credit card lending throughout the United States targeted at, among others, consumers who have inadequate or poor credit histories and consequently, have limited credit options.

5.      At all times relevant to this proceeding, CompuCredit has been an "institution-affiliated party", as that term is defined in section 3(u) of the FDI Act, 12

2

U.S.C. § 1813(u), and for purposes of section 8(b) and 8(i) of the Act, 12 U.S.C. §§ 1818(b) and 1818(i).

6.  The FDIC is the "appropriate Federal banking agency", as that term is defined in section 3(q)(3) of the FDI Act, 12 U.S.C. § 1813(q)(3), with respect to the Bank, and has jurisdiction over the Bank and CompuCredit, as an institution-affiliated party of the Bank, and the subject matter of this proceeding.

## VIOLATIONS OF SECTION 5 OF THE FEDERAL TRADE COMMISSION ACT

### (as to the Bank and CompuCredit)

7.  At all times relevant to this proceeding, the Bank's acts and practices, as described in this NOTICE, have been in or affecting "commerce," as that term is defined in section 4 of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 44.

8.  At all times relevant to this proceeding, CompuCredit's acts and practices, as an institution-affiliated party of the Bank, as described in this NOTICE, have been in or affecting "commerce," as that term is defined in section 4 of the FTC Act, 15 U.S.C. § 44.

9.  Beginning in at least March 2005, the Bank and CompuCredit engaged in unfair or deceptive acts and/or practices in violation of section 5(a) of the FTC Act, 15 U.S.C. § 45(a) (Section 5), in connection with their credit card programs as more fully alleged below.

10.  CompuCredit is engaged in and, since at least 1997, has been engaged in the business of providing various consumer credit products, including credit cards, and related financial services throughout the United States.  CompuCredit offers these products and services by, among other things, entering into contracts with banks,

3

EXHIBIT D - 3

including the Bank, pursuant to which CompuCredit markets and services credit cards.

11. On or about March 2, 2005, the Bank and CompuCredit first entered into an Affinity Card Program Agreement and Accounts Ownership and Administration Agreement (Affinity Agreement) providing for the marketing and issuance of credit cards.

12. The Bank and CompuCredit first began marketing credit cards in or about July 2005.

13. At all times relevant to this proceeding, there has been an Affinity Agreement in place between the Bank and CompuCredit.

14. Pursuant to the Affinity Agreement, the Bank issues the credit cards and owns the credit card accounts. CompuCredit markets the credit cards and services the accounts. CompuCredit also purchases the credit card receivables from the Bank on a daily basis, and pays the Bank a monthly fee based upon the number of account statements processed.

15. Since at least July 2005, the Bank and CompuCredit marketed credit cards throughout the United States under the brand name Aspen. The Aspen brand included at least two credit card products -- referred to internally by the Bank and CompuCredit as Aspen M and Aspen S.

16. Under the Affinity Agreement, CompuCredit had the sole and exclusive right to solicit applications for the Aspen products. CompuCredit created, designed, and distributed the marketing materials; established the credit cards' terms and conditions; developed the underwriting and credit criteria; and maintained customer service functions.

4

EXHIBIT D - 4

17.    The Affinity Agreement required CompuCredit to submit all marketing and solicitation materials, such as mail solicitations, telemarketing scripts, promotional material and advertising, to the Bank for prior review and approval before they were used in the Aspen credit card programs.

18.    The Affinity Agreement included an exhibit that set forth the account terms for the Aspen programs, including the card holder agreements and the interest rates, fees and charges to be paid by the consumer.

19.    Pursuant to the Affinity Agreement, the Bank and CompuCredit agreed to cooperate to develop one or more manuals of operations, policies and procedures for the operation of the Aspen programs.

20.    As the credit card issuer and the owner of the Aspen credit card accounts, the Bank was responsible for ensuring that the Aspen credit card marketing and solicitation practices complied with all applicable laws, including Section 5.

21.    Pursuant to the Affinity Agreement, CompuCredit was responsible for ensuring that the Aspen credit card marketing and solicitation practices complied with all applicable laws, including Section 5.

I.    **Aspen S Credit Card Program**

22.    The Bank and CompuCredit marketed the Aspen S credit cards through pre-screened direct mail solicitations, inbound and outbound telemarketing, and the Internet.

23.    As described below, the Bank and CompuCredit's written solicitations for the Aspen S card misled consumers into believing that they would receive a MasterCard credit card with $300 in available credit.  The Bank and CompuCredit also

5

EXHIBIT D - 5

failed to adequately disclose the significant up-front fees they charged consumers.

24.     Beginning approximately October 2005, the Bank and CompuCredit marketed the Aspen S card.

25.     The Bank and CompuCredit targeted consumers whose credit scores were typically between 460 and 600, and who had limited credit options.

26.     The Aspen S product was marketed as a MasterCard credit card with an initial credit limit of typically $300 with no deposit required, no deposit fee, and/or no application fee.

27.     However, initial fees, typically consisting of an annual fee of $150 and an account opening fee of $29, were charged and posted to the consumer's Aspen S account immediately after the consumer applied for and was issued a card.

28.     The Bank and CompuCredit also typically charged the consumer a monthly maintenance fee of $6.50.  In some instances, this fee was posted to the consumer's account immediately after the consumer was issued a card.  In other instances, the monthly maintenance fee was not billed to the account until the consumer made his or her first purchase.

29.     The Aspen S initial fees and charges of $185.50 reduced the consumer's available credit from $300 to $114.50 before the consumer ever used the card.

30.     As part of this program, consumers were required to make an initial minimum payment of $20, sometimes referred to as an "activation payment," before the Aspen S card could be used.

### Deceptive Marketing Materials and Practices

31.     At all times relevant to this proceeding, the Bank and CompuCredit

6

marketed the Aspen S card by sending consumers direct mail solicitation packages.

32.    A typical and illustrative direct mail solicitation package contained the following items: (1) an outside envelope, (2) a one-page cover letter, (3) a one-page document titled "MasterCard Pre-Qualified Acceptance Certificate," (4) a folded insert titled "Introducing: the Aspen MasterCard Card," and (5) a two-sided document titled "Summary of Credit Terms" on one side and "Terms of Offer" on the other.

33.    A typical and illustrative direct mail solicitation package repeatedly and with bold emphasis used words and phrases like "pre-qualified," "no application fee," and "no deposit required."  The cover letter of the solicitation package stated that the consumer was pre-qualified for an unsecured Aspen MasterCard card with a credit limit of $300.

34.    The solicitation failed to adequately disclose that consumers would be immediately billed the $150 annual fee, the $29 account opening fee, and for certain solicitations, the $6.50 monthly maintenance fee.  The solicitation package also did not adequately disclose that consumers would be required to make an initial payment before the Aspen S card would be activated.  For some solicitations, the package did not adequately disclose that once the card was used, a $6.50 monthly account maintenance fee would be charged to the account.

35.    A typical and illustrative direct mail solicitation package manipulated the words used or omitted words, the placement and size of the text used, and the overall arrangement of the solicitation packages to represent, expressly or by implication, that consumers were pre-approved to receive a credit card that had $300 in available credit.

36.    These direct mail solicitation packages, when viewed as a whole, were

7

EXHIBIT D - 7

deceptive in nature because they failed to adequately disclose the actual available credit and the actual costs of the Aspen S card and the impact of the fees and costs on the available credit.

37.    The solicitation package instructed consumers who wished to obtain the Aspen MasterCard card to complete and return the "Acceptance Certificate," call a toll-free number, or respond over the Internet.

38.    Upon the consumer's acceptance of the Aspen S card direct mail solicitation offer, if the consumer was approved for the card, he or she was sent a fulfillment package.

39.    The fulfillment package included the consumer's Aspen S credit card that was not activated, a copy of the Bank Credit Card Agreement, and a payment coupon informing the consumer that an initial payment of $20 was required before the card could be activated and used.  The package also listed a phone number the consumer could call to pay the initial payment by telephone.  The $20 payment was applied against the consumer's Aspen S account balance.

40.    A typical and illustrative fulfillment package included in small type and on the reverse side of the credit card carrier information that there is an "annual fee," an "account opening fee," and a "monthly maintenance fee."  This information was not as clear or prominent as, or in any proximity to, the representations about how to activate the card.

41.    The fulfillment package led consumers to believe that they were obligated to make only a $20 payment to activate the card and did not disclose, or disclosed inadequately, that significant up-front fees had been charged to the account.

EXHIBIT D - 8

## II.   Aspen M Balance Transfer Program

42.     Aspen M was a balance transfer credit card program designed to transfer outstanding balances on payday loans originated by Community State Bank, Milbank, South Dakota, an affiliated institution of the Bank.

43.     Aspen M accounts were initially opened with a credit limit of $300. The card was not issued until the transferred payday loan account balance fell below $300.

44.     The majority of consumers solicited for this program had existing balances that exceeded the initial $300 initial credit limit of the card. As a result, most consumers did not receive a credit card upon application, and those who did had limited credit availability with this product.

45.     Aspen M cards did not have an annual fee or an account opening fee.

46.     Aspen M cards were subject to a monthly maintenance fee of $9.95, and the accounts were assessed interest and other fees such as overlimit and late fees.

47.     The Bank and CompuCredit marketed the Aspen M card beginning in July 2005.

### Deceptive Marketing Materials and Practices

48.     At all times relevant to this proceeding, the Bank and CompuCredit marketed the Aspen M card by sending consumers direct mail solicitation packages.

49.     A typical and illustrative direct mail solicitation package described the card as providing the "convenience of a MasterCard," "unsecured credit," and the ability "to make purchases anywhere you see the MasterCard logo."   In a separate paragraph, the typical solicitation stated that "Your initial balance may exceed your initial credit limit." The actual credit limit of the Aspen M card of $300 is disclosed in small print in

9

EXHIBIT D - 9

the Terms of Offer section of the solicitation package.

50.     The solicitations misled consumers into believing that they would immediately receive a credit card upon their acceptance of the offer.  In fact, the majority of those solicited had balances transferred exceeding $300, and were not immediately eligible for a credit card.

51.     In addition, the solicitation materials contained representations that the consumers' credit ratings would improve if they applied for the card. In fact, the majority of consumers who applied for the Aspen M card actually experienced a negative impact on their credit rating.  The Bank and CompuCredit's claims regarding credit rehabilitation were false and deceptive.

### One Percent Minimum Payment Program for Past Due Accounts

### Aspen S and Aspen M

52.     At all times relevant to these proceedings, in numerous instances, the Bank and CompuCredit automatically, and with no prior notice, placed consumers who were more than 90 days delinquent on their Aspen S and Aspen M accounts into a payment reduction program known as the "1% Minimum Payment Program."

53.     At all times relevant to these proceedings, neither the payment reduction program, nor its terms and conditions, were adequately disclosed or explained to consumers prior to their being placed in the program.

54.     Under this program, consumers were allowed to pay either 1% of their outstanding balance or $10, whichever was greater.

55.     The Bank and CompuCredit represented, expressly or by implication, to consumers whose accounts were more than 90 days past due that enrollment in this

10

program would help them become current on their accounts.

56.     The Bank and CompuCredit failed to disclose the effects of the reduced minimum payments, including that such payments may not cover all the fees and charges assessed during the period of reduced minimum payments, resulting in an increase in the overall account balance and possibly the imposition of additional fees, including, but not limited to, overlimit fees.

57.     By reason of the foregoing, the Bank and CompuCredit's failure to disclose or failure to disclose adequately, material information regarding the 1% Minimum Payment Program was a deceptive act or practice in violation of Section 5.

58.     By reason of the acts and practices described in paragraphs 7 through 57, the Bank and CompuCredit violated Section 5 as follows:

(a)     The Bank and CompuCredit represented, expressly or by implication, that consumers were "pre-qualified" to receive an Aspen S credit card with $300 of available credit by opening an account.  In fact, consumers who responded to the solicitations and opened an account received only $114.50 or $121 of available credit due to the significant fees billed immediately to their accounts.  Therefore, the Bank and CompuCredit's representations regarding the amount of credit that consumers would receive were false or misleading and a deceptive practice.

(b)     The Bank and CompuCredit represented, expressly or by implication, that consumers solicited for the Aspen S product were "pre-qualified" to receive a credit card with $300 of available credit with "No deposit required," "No deposit fee," and "No application fee."  The Bank and CompuCredit failed to disclose or disclosed inadequately, that consumers would be charged substantial up-front fees,

11

including an annual fee, an account opening fee, and a monthly maintenance fee. In light of the representations made, the Bank and CompuCredit's failure to disclose or disclosed inadequately, the material information about the up-front fees that the consumer would be charged, was a deceptive practice.

(c)    The Bank and CompuCredit represented, expressly or by implication, that consumers solicited for the Aspen M product would receive a credit card immediately upon opening an account. In fact, the Bank and CompuCredit did not immediately issue Aspen M cards to consumers whose transferred debt exceeded $300.00. The Bank and CompuCredit's representations regarding the material information was false or misleading and a deceptive practice.

(d)    The Bank and CompuCredit, represented, expressly or by implication, that consumers solicited for the Aspen M product would be able to improve their credit rating by applying for the card. In fact, the majority of consumers experienced a negative impact on their credit rating by participating in the program. The Bank and CompuCredit's representations regarding credit rehabilitation were false or misleading and a deceptive practice.

(e)    The Bank and CompuCredit represented, expressly or by implication, to Aspen S and Aspen M consumers whose accounts were more than 90 days delinquent that enrollment in the 1% Minimum Payment Program would help them become current on their accounts. The Bank and CompuCredit failed to disclose the effects of the reduced minimum payments, including that such payments may not cover all fees and charges assessed during the period of reduced payments, resulting in an increase in the overall account balance and possibly the imposition of additional fees,

12

including but not limited to, overlimit fees. The Bank and CompuCredit's failure to disclose this program, or failure to disclose it adequately, was a deceptive practice.

59.    The actions alleged in paragraphs 7 through 57 above beginning in July 2005, represent the Bank and CompuCredit's violations of Section 5 related to the Aspen Programs.

## VIOLATIONS OF OTHER LAWS

### (as to the Bank only)

60.    Part 332 of the FDIC's Rules and Regulations, 12 C.F.R. Part 332 (implementing Gramm-Leach-Bliley Act Consumer Safeguards) requires banks to provide a clear and conspicuous initial notice that accurately reflects its privacy policies and practices to an individual who becomes its customer. Despite the fact that the Bank has a privacy policy notice that it provides to consumers, instances were found where the safeguards promised in the notice were not fully implemented in violation of the regulation.

61.    Section 3500.7(c) of Regulation X of the Department of Housing and Urban Development requires that good faith estimates consist of estimated charges that will be listed on Section L of HUD-1 or HUD1A, that the borrower will normally pay or incur based on common practice in the locality of the mortgaged property and that will bear a reasonable relationship to the charges a borrower is likely to be required to pay at settlement. In regards to certain junior liens approved by the Bank, the good faith estimates provided by the Bank failed to include all of the estimated costs payable to close the loan in violation of Regulation X.

62.    Section 226.17(c) of the Truth in Lending Act (TILA) requires that

13

EXHIBIT D - 13

disclosures shall reflect the terms of the legal obligation between the parties. This statute goes on to require that when any information necessary for accurate disclosure is unknown, the disclosure must be based on the best information reasonably available and the creditor must state that the disclosure is an estimate. The Bank originated auto-equity loans marketed through Valued Services. Certain loans issued pursuant to this program did not accurate reflect the terms of the legal obligations as required by TILA.

63.    Section 343.40 of the FDIC's Rules and Regulations sets forth various requirements regarding banks that sell insurance products on bank premises. The Bank violated these regulations by failing to provide proper disclosures to consumers as well as by failing to obtain required consumer acknowledgements.

## UNSAFE OR UNSOUND BANKING PRACTICES

### (as to the Bank only)

64.    The Bank engaged in unsafe and/or unsound banking practices in that it failed to comply with the guidance set forth in the *Unfair or Deceptive Acts or Practices by State-Chartered Banks,* FIL-26-2004 (March 11, 2004).

65.    The Bank engaged in unsafe and/or unsound banking practices by operating with an inadequate compliance management system to ensure compliance with Section 5 and other federal consumer protection laws and regulations.

66.    The Bank engaged in unsafe and/or unsound banking practices by operating without policies, practices, or systems that comply with the *Account Management and Loss Allowance Guidance for Credit Card Lending,* FIL-2-2003 (January 8, 2003).

67.    Each of the unfair or deceptive acts and practices described in paragraphs

14

7 through 57 above are also unsafe and/or unsound banking practices within the meaning of section 8(b)(1) of the FDI Act, 12 U.S.C. § 1818(b)(1).

68.    Each of the violations of law, rules, or regulations described in paragraphs 60 through 63 above are also unsafe and/or unsound banking practices with the meaning of section 8(b)(1) of the FDI Act, 12 U.S.C. § 1818(b)(1).

69.    By reason of the violations of law and the unsafe and/or unsound banking practices alleged in paragraphs 7 through 63 above, especially the violations of Section 5, the Bank engaged in unsafe and/or unsound banking practices by failing to provide effective oversight and supervision of its third party service providers.

## RESTITUTION

### (as to the Bank and CompuCredit)

70.    Each of the unfair or deceptive acts and practices described in paragraphs 7 through 57 above resulted in unjust enrichment to the Bank and CompuCredit within the meaning of 12 U.S.C. § 1818(b)(6).

71.    Each of the unfair or deceptive acts and practices described in paragraphs 7 through 57 above involved a reckless disregard for the law within the meaning of 12 U.S.C. § 1818(b)(6).

72.    As a result of the conduct described in paragraphs 1 through 71 above, consumers were aggrieved in an amount not presently ascertainable, but likely to exceed $15 million.

## NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES; FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER TO PAY; AND NOTICE OF HEARING

### (as to the Bank and CompuCredit)

73.     The FDIC incorporates the allegations of paragraphs 1 through 72 as FINDINGS OF FACT AND CONCLUSIONS OF LAW for purposes of this NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES (NOTICE OF ASSESSMENT) as though fully set out herein.

### ORDER TO PAY – FIRST BANK & TRUST

74.     By reason of the violations of law set forth in the NOTICE OF ASSESSMENT, the FDIC has concluded that a civil money penalty should be assessed against the Bank pursuant to section 8(i)(2) of the FDI Act, 12 U.S.C. § 1818(i)(2).  After taking into account the appropriateness of the penalties with respect to the size of the financial resources and good faith of the Bank, the gravity of the violations, the history of previous violations, and such other matters as justice may require, it is:

ORDERED that by reason of the violations set forth in the NOTICE OF ASSESSMENT, a penalty of One Hundred and Twenty Seven Thousand Dollars ($127,000) be, and hereby is, assessed against the Bank pursuant to section 8(i)(2) of the FDI Act, 12 U.S.C. § 1818(i)(2);

FURTHER ORDERED, that the effective date of this ORDER TO PAY be, and hereby is, stayed with respect to the Bank until 20 days after the date of service of the NOTICE OF ASSESSMENT on the Bank, during which time the Bank may file an answer and request a hearing pursuant to section 8(i)(2)(H) of the FDI Act, 12 U.S.C. § 1818(i)(2)(H), and section 308.19 of the FDIC's Rules of Practice and Procedure, 12

16

C.F.R. § 308.19.

75.    The Bank must specifically request a hearing within 20 days of service of the NOTICE OF ASSESSMENT on the Bank pursuant to section 8(i)(2)(H) of the FDI Act, 12 U.S.C. § 1818(i)(2)(H), and section 308.19 of the FDIC's Rules of Practice and Procedure, 12 C.F.R. § 308.19.   If the Bank fails to request a hearing within 20 days of service of this NOTICE OF ASSESSMENT, the penalty assessed against the Bank pursuant to the ORDER TO PAY will be final and unappealable and shall be paid within 60 days after the date of service of this NOTICE OF ASSESSMENT on the Bank.

76.    In the event the Bank requests a hearing, the Bank shall also file an answer to the charges in the NOTICE OF ASSESSMENT within 20 days of service of the NOTICE OF ASSESSMENT on the Bank in accordance with section 308.19 of the FDIC's Rules of Practice and Procedure, 12 C.F.R. § 308.19.

## ORDER TO PAY – COMPUCREDIT

77.    By reason of the violations of law set forth in the NOTICE OF ASSESSMENT, the FDIC has concluded that a civil money penalty should be assessed against CompuCredit pursuant to section 8(i)(2) of the FDI Act, 12 U.S.C. § 1818(i)(2). After taking into account the appropriateness of the penalties with respect to the size of the financial resources and good faith of CompuCredit, the gravity of the violations, the history of previous violations, and such other matters as justice may require, it is:

ORDERED that by reason of the violations set forth in the NOTICE OF ASSESSMENT, a penalty of Five Hundred and Fifty-Eight Thousand Dollars ($558,000) be, and hereby is, assessed against CompuCredit pursuant to section 8(i)(2) of the FDI Act, 12 U.S.C. § 1818(i)(2);

17

FURTHER ORDERED, that the effective date of this ORDER TO PAY be, and hereby is, stayed with respect to CompuCredit until 20 days after the date of service of the NOTICE OF ASSESSMENT on CompuCredit, during which time CompuCredit may file an answer and request a hearing pursuant to section 8(i)(2)(H) of the FDI Act, 12 U.S.C. § 1818(i)(2)(H), and section 308.19 of the FDIC's Rules of Practice and Procedure, 12 C.F.R. § 308.19.

78.    CompuCredit must specifically request a hearing within 20 days of service of the NOTICE OF ASSESSMENT on CompuCredit, pursuant to section 8(i)(2)(H) of the FDI Act, 12 U.S.C. § 1818(i)(2)(H), and section 308.19 of the FDIC's Rules of Practice and Procedure, 12 C.F.R. § 308.19.  If CompuCredit fails to request a hearing within 20 days of service of this NOTICE OF ASSESSMENT, the penalty assessed against CompuCredit pursuant to the ORDER TO PAY will be final and unappealable and shall be paid within 60 days after the date of service of this NOTICE OF ASSESSMENT on CompuCredit.

79.    In the event CompuCredit requests a hearing, CompuCredit shall also file an answer to the charges in the NOTICE OF ASSESSMENT within 20 days of service of the NOTICE OF ASSESSMENT on CompuCredit, in accordance with section 308.19 of the FDIC's Rules of Practice and Procedure, 12 C.F.R. § 308.19.

## NOTICE OF HEARING

80.    Notice is hereby given that a hearing will be held in Rapid City, South Dakota, commencing 60 days from the date of service of the NOTICE OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND FOR RESTITUTION, or on such date and at such place as may be set by the Administrative Law Judge appointed to hear

18

the matter, for the purpose of taking evidence on the charges specified in the NOTICE

OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND FOR

RESTITUTION and to determine whether an appropriate order should be issued under

the FDI Act requiring the Bank and CompuCredit to:

(a)    cease and desist from the unsafe or unsound banking practices and

violations of law specified therein; and

(b)    take affirmative action to correct the conditions resulting from such

practices and violations, including making restitution and/or providing reimbursement to

affected consumers.

81.    If the Bank or CompuCredit requests a hearing with respect to the charges

specified in the NOTICE OF ASSESSMENT, evidence shall also be taken on the charges

specified therein at the same time and place for the purpose of determining whether the

Bank shall be ordered to forfeit and pay a civil money penalty in accordance with section

8(i)(2) of the FDI Act, 12 U.S.C. § 1818(i)(2).

82.    The hearing will be held before an Administrative Law Judge to be

appointed by the Office of Financial Institution Adjudication pursuant to 5 U.S.C. §

3105. The hearing will be public, and in all respects will be conducted in compliance

with the FDI Act, the Administrative Procedures Act, 5 U.S.C. §§ 551 - 559, and the

FDIC Rules of Practice and Procedure, 12 C.F.R. Part 308.

83.    The Bank and CompuCredit are each directed to file an answer to the

NOTICE OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND FOR

RESTITUTION within 20 days from the date of service on the Bank or CompuCredit, as

provided in 12 C.F.R. § 308.19 of the FDIC Rules of Practice and Procedure.

19

84.    The original and one copy of all papers filed or served in this proceeding shall be filed with the Office of Financial Institution Adjudication, 1700 G Street, N.W., Washington, D.C. 20552, pursuant to section 308.10 of the FDIC Rules of Practice and Procedure, 12 C.F.R. § 308.10.  Copies of all papers filed or served in this proceeding shall be served upon Robert Feldman, Executive Secretary, Federal Deposit Insurance Corporation, 550 17th Street, N.W. (F-1058), Washington, D.C. 20429-9990; A.T. Dill III, Senior Counsel, Enforcement Unit, Legal Division, Federal Deposit Insurance Corporation, 550 17th Street, N.W. (MB-3124), Washington, D.C. 20429-9990; and Arturo Vera-Rojas, Regional Counsel (Supervision), Federal Deposit Insurance Corporation, 2345 Grand Boulevard, Suite 1200, Kansas City, Missouri 64108.

Pursuant to delegated authority.

Dated this 16th day of June 2008.

Sandra L. Thompson
Director
Division of Supervision and Consumer Protection

20

EXHIBIT D - 20