# Exhibit E

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| | ) ORDER TO CEASE AND DESIST |
| | ) |
| COLUMBUS BANK AND TRUST COMPANY | ) AND ORDER TO PAY |
| COLUMBUS, GEORGIA | ) |
| | ) |
| (INSURED STATE NONMEMBER BANK) | ) FDIC-08-033b |
| | ) FDIC-08-034k |

COLUMBUS BANK AND TRUST COMPANY, Columbus, Georgia (Bank), having been advised of its right to a Notice of Charges and of Hearing under section 8(b) of the Federal Deposit Insurance Act (Act), 12 U.S.C. § 1818(b), and a Notice of Assessment of Civil Money Penalty, Findings of Fact and Conclusions of Law, Order to Pay, and Notice of Hearing under section 8(i)(2) of the Act, 12 U.S.C. § 1818(i)(2), detailing the violations of law and/or regulations and unsafe or unsound banking practices alleged to have been committed by the Bank, and of its right to a hearing with respect to the foregoing, and having waived those rights, entered into a STIPULATION AND CONSENT TO THE ISSUANCE OF AN ORDER TO CEASE AND DESIST AND ORDER TO PAY AND OF AN ORDER FOR RESTITUTION (CONSENT AGREEMENT) with a representative of the Legal Division of the Federal Deposit Insurance Corporation

Page 1 of 20

EXHIBIT E - 1

(FDIC), dated June ___, 2008, whereby, solely for the purpose of this proceeding and without admitting or denying the alleged violations of law and/or regulations and unsafe or unsound banking practices, the Bank consented to the issuance of this ORDER TO CEASE AND DESIST AND ORDER TO PAY (ORDER) by the FDIC.

WHEREAS, the FDIC is committed to ensuring that marketing practices in connection with credit card products offered to consumers by insured depository institutions and third party service providers adequately disclose the fees, effective credit limits, and other key terms and limitations;

WHEREAS, the Bank is committed to the implementation of policies and procedures to assure that the products and services it offers to consumers directly and through third party service providers are provided in a manner that complies with all applicable federal consumer protection laws, and allows for informed consumer choice; and

WHEREAS, the FDIC considered the matter and determined that it has reason to believe that the Bank committed violations of law and/or regulations and engaged in unsafe or unsound banking practices.

**NOW THEREFORE**, the FDIC accepts the CONSENT AGREEMENT and issues the following:

Page 2 of 20

EXHIBIT E - 2

## ORDER TO CEASE AND DESIST

IT IS HEREBY ORDERED, that the Bank, its institution-affiliated parties, as that term is defined in section 3(u) of the Act, 12 U.S.C. § 1813(u), and its successors and assigns, cease and desist from the following unsafe or unsound banking practices and violations of law and/or regulations:

(a)   operating the Bank without a compliance program to ensure effective oversight by the Board of Directors (Board) and supervision by executive management of its Visa branded credit card programs marketed and serviced by a third-party pursuant to an affinity contractual agreement with the Bank (third-party credit card programs);

(b)   operating in violation of section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) (Section 5);

(c)   operating with an inadequate compliance management system to ensure compliance with Section 5 and other federal consumer protection laws and regulations.

IT IS FURTHER ORDERED that the Bank, its institution-affiliated parties, and its successors and assigns, take affirmative action as follows:

## AFFIRMATIVE RELIEF

1.   Within ninety (90) days of the effective date of this

Page 3 of 20

EXHIBIT E - 3

ORDER, the Bank shall eliminate or correct all violations of Section 5 and other federal consumer protection laws and regulations cited in the FDIC's Compliance Report of Examination dated August 28, 2006 (Compliance Report).  In addition, the Bank shall take all necessary steps to ensure future compliance with Section 5 and all other applicable federal consumer protection laws and all implementing rules and regulations, regulatory guidance, and statements of policy in third party credit card programs.

2.  The Bank shall, directly or indirectly, disclose as clearly and prominently as, and on the same page as, any representation about credit limits or available credit, in any credit card solicitation:

(a) a description of:

(i) all initial fees (Initial Fees), as defined below;

(ii) all other fees imposed for the issuance or availability of a credit card, or imposed based on account activity or inactivity, other than:  (A) any fee imposed for an extension of credit in the form of cash; (B) any fee imposed for a late payment; or (C) any fee imposed in connection with an

extension of credit in excess of the amount of credit authorized to be extended with respect to such account; or (D) any fee imposed in connection with foreign country transactions or foreign currency exchange;

(iii) the amount and timing of all such fees; and

(iv) all other restrictions imposed for the issuance or availability of credit;

(b) if the aggregate amount of the Initial Fees or other restrictions that affect initial available credit is material, the amount of credit available upon activation after application of the Initial Fees and other restrictions, *provided* that if the solicitation offers a credit limit of "up to" a certain amount, the amount of available credit after application of Initial Fees and restrictions shall be expressed as an example of a typical offer of credit; and

(c) if the effect of the fees described in subparagraph 2(a)(ii) or the restrictions described in subparagraph 2(a)(iv) on available credit is material, a description of the effect of such fees or restrictions on available credit.

(d) "Initial Fees" shall mean any annual,

Page 5 of 20

EXHIBIT E - 5

activation, account opening, membership, periodic, or other fee imposed for the issuance or availability of a credit card, at the time the account is opened; *provided* that "Initial Fees" shall not include: (i) any fee imposed for an extension of credit in the form of cash; (ii) any fee imposed for a late payment; or (iii) any fee imposed in connection with an extension of credit in excess of the amount of credit authorized to be extended with respect to such account.

3.    The Bank shall not make, directly or indirectly, any misrepresentation, expressly or by implication, about any material term of an offer or extension of credit including, but not limited to, the amount of available credit or the relationship between an offer or extension of credit and a debt repayment plan or the repayment of existing debt, in connection with the advertising, marketing, soliciting, extending, billing or servicing of credit card programs.

## COMPLIANCE MANAGEMENT SYSTEM

4.    The Board shall participate fully in the oversight of the Bank's compliance management system (CMS) and demonstrate clear and unequivocal expectation regarding compliance.  As part of its CMS, the Bank submitted to the Regional Director of the FDIC's Atlanta Regional Office (Regional Director) in September

2006, a Compliance Risk Management Program (Compliance Plan), which it has been implementing.  The Bank shall continue to (i) implement and modify the Compliance Plan, as necessary, to maintain a sound risk-based CMS designed to ensure that the Bank's third-party credit card programs comply with Section 5 and all applicable federal consumer protection laws and all implementing rules and regulations, regulatory guidance, and statements of policy and (ii) update and modify the Compliance Plan and the CMS, if necessary, to include, at a minimum, the following:

(a)   The Compliance Plan shall include an effective monitoring system with provisions addressing to the satisfaction of the Regional Director:

(i) Bank review, approval, and maintenance of copies of (A) all marketing and solicitation materials, including direct mail or internet solicitations, promotional materials, advertising and telemarketing scripts, (B) other materials provided to consumers and cardholders generated in connection with the administration and servicing of the third-party credit card programs, including cardholder agreements, privacy policy and form of cardholder statement, and (C) changes or amendments with respect to the materials described in (A) and

(B);

(ii) prompt notification to the Bank by any third-party credit card program partner and any vendor or servicer providing services material to the Bank's third-party credit card programs (Vendor), of all regulatory agencies' inquiries, customer complaint correspondence, and/or legal action received from any third-party with respect to the third-party credit card programs (other than routine requests such as to cease and desist collection contact);

(iii) (A) Bank review and approval of materials related to customer service, including compliance with the guidance set forth in FIL-52-2006 (June 21, 2006); (B) monitoring of a sample of customer service calls on a regular basis; (C) Bank review of service level reports; and (D) procedures for working with third-party credit card program partners and Vendors to timely resolve any customer complaints and issues;

(iv) Bank review and approval of all materials relating to collection activities and monitoring of a sample of collection calls on a regular basis;

(v) Bank review of periodic quality assurance reports, reports on collection results, collector evaluation

Page 8 of 20

EXHIBIT E - 8

results, and disciplinary action reports for each call center;

(vi) Bank review of all third-party credit card program partners' and Vendors' credit, fraud, and risk management materials, including policy manuals and practices, to determine compliance with all applicable consumer protection laws;

(vii) Bank review and approval of arrangements between third-party credit card program partners and Vendors, and monitoring and periodic reviews, including the review of quality assurance reports and review of on-site audits of Vendors;

(viii) periodic review by the Bank of account services materials, including materials related to customer chargeback and dispute processing, mail forwarding, returned mail and copy requests;

(ix) Bank review and regular monitoring of third-party credit card program partners' and Vendors' materials relating to suspense item research, general ledger reconcilement and settlement, including daily settlement reports and monthly settlement reports;

(x) Bank review of materials related to the financial performance of the third-party credit card programs

and performance monitoring, on a monthly basis, of assets in the third-party credit card programs as a whole and by vintage and campaign, including new accounts established, receivables growth or decline, charge-offs, credit risk scores (such as FICO scores), sources of revenue (APRs and fees), number of accounts receiving credit line increases and decreases, and APR increases or reductions;

(xi) Bank monitoring of the performance of marketing and solicitation programs for credit card accounts and enhancement products, including numbers of accounts offered, the products in each campaign and response rate, and production and review of trend analysis;

(xii) mandatory regular compliance reviews by the Bank, including policies and procedures, and internal compliance audits and on-site visits to service facilities of all third-party credit card program partners and material service providers;

(xiii) Bank review of business and strategic plans relating to credit card programs conducted by the Bank with third-party credit card program partners;

(xiv) Bank maintenance of records of all approved consumer materials, complaints and responses, solicitation

EXHIBIT E - 10

materials, administration materials and service provider agreements, relating to the Bank's third-party credit card programs;

(xv) Bank maintenance of files documenting the service level standards for those services provided in connection with third-party credit card programs, including due diligence reports, monitoring and audit results, and financial materials;

(xvi) Bank conducting regular meetings with its third-party credit card program partners and Vendors, for which written minutes will be taken and maintained;

(xvii) Bank monitoring of third-party membership programs, if any; and

(xviii) periodic Bank monitoring of the use and security of confidential and nonpublic personal information.

(b)    The Bank's CMS shall also provide for the establishment and implementation of an effective training program that includes regular, specific, comprehensive training in applicable federal consumer protection laws, including Section 5, and all implementing rules and regulations, and regulatory guidance, and statements of policy, for appropriate Bank personnel.

EXHIBIT E - 11

(c)    The Bank's CMS shall include procedures for promptly addressing and resolving consumer complaints regarding the third-party credit card programs, regardless of the source.

(d)    The Bank's CMS shall be administered by compliance personnel with sufficient experience in, and knowledge of, Visa or MasterCard branded programs and consumer compliance laws and regulations, and whose names and qualifications have been or shall be submitted to the Regional Director.    The CMS shall provide for sufficient staff personnel to assist the Bank's compliance officer.

(e)    The Bank's CMS shall provide for an independent audit program of the Bank's third-party credit card programs including, but not limited to, the Bank's management, supervision and oversight of Vendors. For purposes of this provision, an audit program conducted by the internal audit group of Synovus Financial Corporation shall constitute an independent audit program.

(f)    The Compliance Plan shall provide for compliance with the *Account Management and Loss Allowance Guidance for Credit Card Lending*, FIL-2-2003 (January 8, 2003).

(g)    No later than 45 days after the effective date of this ORDER, the Bank shall submit its Compliance Plan, with any

revisions necessary to comply with this ORDER, to the Regional Director for review and approval.  The Bank shall not authorize, initiate or otherwise allow any third-party credit card program solicitation or marketing campaign until such time that the Regional Director approves in writing the revised Compliance Plan.  The Board's review and approval of any revisions to the Bank's Compliance Plan shall be recorded in the minutes.

### ACCOUNT MANAGEMENT GUIDANCE

5.    (a) Within sixty (60) days of the effective date of this ORDER, the Bank shall implement policies, practices and systems to comply with the *Account Management and Loss Allowance Guidance for Credit Card Lending*, FIL-2-2003 (January 8, 2003). Such policies, practices and systems shall include, except as otherwise prohibited by applicable state law:

(i) requiring minimum payments that will preclude negative amortization and will amortize the current balance over a reasonable period of time consistent with the unsecured nature of the underlying debt and the consumer's documented creditworthiness; and

(ii) providing for reasonable control over and timely repayment of amounts that exceed established credit

Page 13 of 20

EXHIBIT E - 13

limits.

(b) To the extent that the Bank causes to be performed, by contract or otherwise, any services for account management and/or account servicing, the Bank shall ensure that all such services are provided in compliance with the requirements of subparagraph 5(a) above.

## DIRECTOR COMPLIANCE COMMITTEE

6.   (a)   The Board shall maintain the Director Compliance Committee (Committee) established in February 2007 to provide enhanced monitoring of management's oversight of the Bank's affinity card relationships.  The Committee shall remain in existence during the term of this ORDER and shall report to the Board and be responsible for overseeing the affirmative action required by this ORDER.  The Committee shall be comprised of at least three (3) independent directors, as defined herein, and may include the non-executive Chairman of the Board.  The Committee shall monitor compliance with this ORDER and by July 10, 2008 and within ten (10) days after the last day of each calendar month thereafter during the life of this ORDER, shall submit to the Board for consideration at its next regularly scheduled meeting a written report detailing the Bank's

Page 14 of 20

compliance with this ORDER, including compliance with the enhanced independent audit program. The Committee's report shall be incorporated into the minutes of the corresponding Board meeting. Nothing herein shall diminish the responsibility of the entire Board to ensure compliance with the provisions of this ORDER.

(b)    For purposes of this ORDER, an "independent director" shall be an individual:

(i)    who is not employed in any capacity by the Bank (except as a director), any subsidiary or affiliate of the Bank, or third party that provides substantial services to the Bank or Synovus Financial Corporation;

(ii)    who does not serve and has not served in any of the past five years as a consultant, advisor, promoter, underwriter, or legal counsel of or to the Bank, or any of its affiliates;

(iii)    who is not related by blood, marriage or common financial interest to an executive officer of the Bank, any subsidiary of the Bank, or any of its affiliates;

(iv)    who is not indebted to the Bank, directly or indirectly (including the indebtedness of any entity in which the individual has a substantial financial interest), other than

Page 15 of 20

as permitted by Regulation O of the Board of Governors of the Federal Reserve System, 12 C.F.R. Part 215;

(v)    who is not employed by any third-party service provider of the Bank; and

(vi)    who is otherwise free of any relationship that would interfere with the exercise of independent judgment.

(c)    Where the Board is required to ensure compliance with the provisions of this ORDER, it is intended to mean that the Board shall:

(i)    authorize and adopt such actions on behalf of the Bank as may be necessary for the Bank to perform its obligations and undertakings under the terms of this ORDER;

(ii)    require the timely reporting by Bank management of such actions directed by the Board to be taken under the terms of this ORDER;

(iii)    follow-up on any non-compliance with such actions in a timely and appropriate manner; and

(iv)    require corrective action to be taken in a timely manner of any non-compliance with such actions.

### PROGRESS REPORTS

7.    The Bank shall furnish a written progress report to the Regional Director by July 10, 2008 and within ten (10) days

Page 16 of 20

EXHIBIT E - 16

after the end of each calendar quarter thereafter, detailing the form and manner of all actions taken to secure compliance with this ORDER and the results of such actions. Such reports may be discontinued when the corrections required by this ORDER have been accomplished and the Regional Director has released the Bank in writing from making further reports. Nothing in this paragraph 7 shall relieve the Bank from compliance with any other reporting requirements or provisions of this ORDER. All progress reports and other written responses to this ORDER shall be reviewed by the Board and made a part of the minutes of the corresponding Board meeting.

## ORDER TO PAY

8. IT IS FURTHER ORDERED THAT, by reason of the alleged violations of law and/or regulations, and after taking into account the CONSENT AGREEMENT, the appropriateness of the penalty with respect to the financial resources and good faith of the Bank, the gravity of the conduct by the Bank, the history of previous conduct by the Bank, and such other matters as justice may require, pursuant to section 8(i)(2) of the Act, 12 U.S.C. § 1818(i)(2), a civil money penalty of $2,400,000 is assessed against the Bank. The Bank shall pay the civil money penalty to the Treasury of the United States. The Bank shall

Page 17 of 20

EXHIBIT E - 17

pay such civil money penalty itself, and is prohibited from seeking or accepting indemnification for such payment from any third-party.

**MISCELLANEOUS**

9.   Except for an action to enforce compliance with this ORDER or the ORDER FOR RESTITUTION issued by the FDIC pursuant to the CONSENT AGREEMENT, and except for any claims against the CompuCredit Parties, as hereinafter defined, the FDIC shall not commence any action under section 8 of the Act, 12 U.S.C. § 1818, Section 5, or any other statute or regulation, against the Bank, or any of its directors, officers, employees, and agents, or any of the Bank's affiliates, their successors or assigns, or any of their respective directors, officers, employees, and agents (collectively, the Bank Parties) arising out of or related to the Aspire Little Rock, Aspire Core, Freedom, and Majestic credit card programs or relating in any manner to the FDIC's Compliance Report of Examination dated August 28, 2006 and related investigations, in each case to the effective date of this ORDER.  The CompuCredit Parties shall mean CompuCredit Corporation, Atlanta, Georgia (CompuCredit), its officers, directors, employees, subsidiaries, successors and assigns, and any party having a contract with CompuCredit or providing

Page 18 of 20

EXHIBIT E - 18

services to or for the benefit of CompuCredit, with the exception of any of the Bank Parties.

10. (a) Except as limited by the CONSENT AGREEMENT and paragraph 9 above, this ORDER shall not bar, estop or otherwise prevent the FDIC or any other federal or state agency or department from taking any action against any of the Bank Parties or any of the Bank's current or former institution-affiliated parties, or any of their respective directors, officers, employees, and agents.

(b) The FDIC expressly reserves all rights against the CompuCredit Parties. Nothing in the CONSENT AGREEMENT or this ORDER shall require the FDIC or any other party to reduce, compromise, or otherwise limit any claims against the CompuCredit Parties.

(c) Nothing in the CONSENT AGREEMENT or ORDER shall require the FDIC or any other party to reduce, compromise, or otherwise limit any claims because of any contractual or other commitments of the Bank to indemnify, defend, or hold harmless any of the CompuCredit Parties.

11. Nothing herein shall prevent the FDIC from conducting on-site reviews and/or examinations of the Bank, its affiliates, agents, service providers, and any other institution-affiliated

Page 19 of 20

EXHIBIT E - 19

parties of the Bank at any time to monitor compliance with this ORDER.

12.  This ORDER shall be effective on the date of issuance.

13.  The provisions of this ORDER shall be binding on the Bank, its direct and indirect subsidiaries (other than its insurance subsidiary and trust services subsidiary regulated under applicable state or federal law), their successors and assigns, and any of their respective directors, officers, employees, and agents, and any of the Bank's institution-affiliated parties.

14.  The provisions of this ORDER shall remain effective and enforceable except to the extent that, and until such time as, any provisions of this ORDER shall have been modified, suspended or terminated in writing by the FDIC.  The Bank may apply to the FDIC for such modification, suspension and/or termination after one year of the effective date of this ORDER.

Pursuant to delegated authority.

Dated at Washington, D.C., this ____ day of June 2008.

Sandra L. Thompson
Director
Division of Supervision and Consumer Protection

Page 20 of 20